In the Matter of the Termination of the Parent–Child Relationship of M.J.G., G.C.G. and G.D.G., Children and Mary and Frank Griffin, Parents.

Mary GRIFFIN and Frank Griffin, Appellants,

v.

BARTHOLOMEW COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee.

No. 03A04–8902–CV–39.

Court of Appeals of Indiana, Fourth District.

Sept. 7, 1989.

Richard T. Eppard, Columbus, for appellants.

Donald J. Dickherber, Lawson, Pushor, Mote & Coriden, Columbus, for appellee.

CHEZEM, Presiding Judge.

## Case Summary

Appellants, Frank and Mary Griffin, appeal the termination of their parental rights pursuant to I.C. 31–6–5–4. We affirm.

## Issue

The sole issue presented for our review is whether the Bartholomew County Department of Public Welfare sustained its burden to prove by clear and convincing evidence there was a reasonable probability the conditions which resulted in the children's removal from the home would not be remedied.

## Facts

Frank and Mary Griffin (the Griffins) are the parents of M.J.G. (born April 4, 1983), G.C.G. (born April 30, 1984) and G.D.G. (born April 30, 1986). Two other children, who are not the subject of this appeal, also have lived in the Griffin home: F.E.G. (born April 4, 1979), son of Frank, but not Mary, and S.G. (born in July, 1988), son of Mary, but not Frank.

On July 1, 1986, the Bartholomew County Department of Public Welfare (Welfare Department) filed a petition alleging M.J.G., G.C.G., G.D.G. and F.E.G. to be children in need of services, pursuant to I.C. 31–6–4–3.[1] The petition resulted from an investigation which ensued after G.D.G. was brought to a hospital with severe injuries to the face and arms. The parents told the police the injuries had been caused by "rat bites." They told the police they awoke to hear the two-month old baby screaming and saw the child was bleeding. There was evidence that Frank Griffin had consumed alcohol that night. Although it was evident from the nature and severity of the injuries that the baby had been screaming for some time, the Bartholomew County Prosecutor decided not to file neglect charges against the Griffins due to lack of evidence.

The investigation disclosed evidence of rat infestation, trash and dirty dishes scattered around the home, a toilet which did not function, perishable foods which were not refrigerated and other unsanitary conditions. The children were dirty and were covered with what appeared to be "insect bites." All four children were removed

---

1. S.G. had not yet been born when the CHINS proceeding was instituted.

from the home, and the house was condemned by the Bartholomew County Department of Public Health. G.D.G. was hospitalized for over one month in Riley Children's Hospital in Indianapolis and requires periodic treatment since the injury to the arms is permanent.

On August 27, 1986, the Griffins admitted the allegations of the Welfare Department's petition. On September 24, 1986, at the dispositional hearing, wardship of the minor children was granted to the Welfare Department, and the Welfare Department was ordered to provide services to the Griffins in an effort to correct the conditions and problems which led to the filing of the petition.

The trial court adopted the recommendations of the Welfare Department in its pre-dispositional report to the court. The Welfare Department had recommended: (1) psychological and academic evaluations for the Griffins with follow-up counseling, (2) cooperation of the Griffins in the areas of "hygiene, housekeeping standards, housing, nutrition, medical care and any other matter relating to the childrens care," and (3) medical and food assistance by the Welfare Department.

On April 17, 1987, F.E.G. was returned to the home and seemed to be adjusting well. On May 19, 1987, the Welfare Department filed a case plan which suggested: (1) housing was no longer a problem; (2) Mary's ability to manage and accept Frank's son, F.E.G., was improving, and all three were in family counseling; (3) Frank's drinking problem was no longer an issue; (4) Frank was now employed, and Mary was receiving S.S.I., which alleviated the income problem; (5) the Griffins were cooperative in dealing with the homemaker services provided by the Welfare Department; and (6) regular and increased visitation had been helpful and would continue. The report noted that Mary found it very stressful caring for all four of the children at once. Also, Mary was pregnant (with S.G.). Counseling was to continue, and if the goals of the plan were met, M.J.G. and G.C.G. would rejoin F.E.G. in the home. G.D.G. would be returned later. A gradual return of the children was suggested to help the children adjust and to help Mary adjust to having all of the children in the home.

In July, 1987, S.G. was born. By November 17, 1987, the Welfare Department noted the Griffins had attended counseling sessions in the past, but they had failed to make any appointments in the recent past. In spite of the failure of the Griffins to make any appointments, progress had been made with the Griffins; Welfare was ready to return M.J.G. and G.C.G. to the Griffin home. However, the return was delayed first due to a lack of beds, then a lack of mattresses for the beds.

The Griffins' home situation then rapidly deteriorated. By May 10, 1988, Mary was no longer living in the rented house and was living with relatives. Frank was serving a jail sentence on alcohol related charges, and F.E.G. was experiencing stress from the unstable environment. At Mary's request, F.E.G. was subsequently removed from the home and initially placed with F.E.G.'s natural mother. Apparently, F.E.G. has now been placed with his maternal grandmother. S.G. remained with Mary, but was considered "high risk"; S.G. and Mary were carefully monitored.

Prior to Frank's incarceration, weekend visits by the other children were reduced to day visits when it became apparent Frank was consuming alcohol and becoming intoxicated during their visits. Further deterioration was evident: Frank had lost his job, the utilities had been disconnected, complaints had been filed regarding the childrens' care and home environment, Frank denied any need for alcohol treatment, and the "new" home was becoming more like the "old" home with holes in the ceiling, trash in the yard and trash in the house.

On May 13, 1988, the Welfare Department filed a petition to terminate the Griffins' parental rights as to M.J.G., G.C.G. and G.D.G. The petition alleged there was a reasonable probability the conditions which led to the filing of the CHINS petition would not be remedied. The court-appointed special advocate agreed with the Welfare Department that parental rights

should be terminated noting that although the Griffins appeared to be caring people, the needs of the children seemed to be beyond their ability. M.J.G. and G.C.G. required speech and hearing therapy; both were diagnosed as being mildly mentally handicapped and had been placed in a special preschool program. G.D.G. still required regular medical attention from the "rat bite" injuries and from birth defects. All three children had made a great deal of improvement in foster care. The special advocate did not believe the parents would be able to deal with the special needs of the children, but rather saw a pattern of problems and irresponsibility on the part of the Griffins. The advocate further added that she believed no benefit would be gained by putting the children through more years of unsettled conditions.

The fact-finding hearing on the petition was set for September 14, 1988. Even after Frank was released from jail, the Griffins remained separated until immediately prior to the hearing. After the hearing, the trial court entered judgment terminating the Griffins' parental rights over M.J.G., G.C.G. and G.D.G by findings of fact and conclusions of law, pursuant to Indiana Rules of Trial Procedure Rule 52.

### Discussion and Decision

The sole issue here is whether the Welfare Department provided the trier of fact with sufficient evidence from which the trier could conclude the Welfare Department proved, by clear and convincing evidence, there is a reasonable probability the conditions which resulted in the child's removal will not be remedied.[2] I.C. 31-6-5-4; *J.K.C. v. Fountain County Department of Welfare* (1984), Ind.App., 470 N.E.2d 88. We conclude such evidence was provided by the Welfare Department.

■ When reviewing a termination of parental rights by trial court we will not not reweigh the evidence, nor will we judge the credibility of the witnesses. Rather, we will only consider the evidence, and inferences reasonably drawn from the evidence, which are most favorable to the judgment. *In The Matter of Campbell* (1989), Ind.App., 534 N.E.2d 273. Furthermore, since the trial court has entered findings of fact and conclusions of law pursuant to Trial Rule 52, we will apply a two-tier standard of review: first, we will determine whether the evidence supports the findings; second, we will determine whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, that the record contains no fact or inferences supporting them. *Keystone Square v. Marsh Supermarkets, Inc.* (1984), Ind.App., 459 N.E.2d 420, 422.

■ The Griffins argue the evidence presented was not clear and convincing. S.G., and for a time F.E.G., was permitted to remain in the home, which the Griffins assert was evidence contrary to the allegations of the petition. In support of their argument, the Griffins cite us to *J.K.C., supra.*, a portion of which reads as follows:

Children are not to be removed from the custody of their parents because there is a better place for them, but because the situation while in the custody of their parents is "wholly inadequate for their survival." (citation omitted)

*Id.* at 93.

The argument asserted by the Griffins is not actually an attack on the sufficiency of the evidence, but rather it is an attack on the weight of the evidence: The argument questions the credibility of the Welfare Department's employees who testified regarding the basis for their opinion that there was a reasonable probability the conditions which created the need for removal of the children would not change. As stated above, we will not reweigh the evidence. *Campbell, supra.*

---

2. The other three elements of the statute are not in dispute. They are as follows:
   (1) The child has been removed from the parent for at least six (6) months under a dispositional decree;
   . . . .

(3) Termination is in the best interests of the child; and
(4) The county department has a satisfactory plan for the care and treatment of the child.
I.C. 31-6-5-4(c).

The alleged contradiction was explained by the Welfare Department. Elona Kirkland, the caseworker for the Welfare Department, explained that Mary appeared to be providing the basic necessities for S.G. at the present time; likewise, prior to S.G.'s birth, Mary was able to care for F.E.G., but Mary appeared to be unable to handle the stress of more than one child in the home at a time. R. at 197–198. At present, only S.G. remains in the home. Thus, the Griffins have not demonstrated how the Welfare Department's action in seeking termination of parental rights as to M.J.G., G.C.G. and G.D.G., while leaving S.G. in the home is "wholly contradictory."

■ The Griffins also imply that the Welfare Department sought termination of parental rights primarily because the Welfare Department perceived that the Griffins were "low functioning" or "limited intellectually" rather than because the survival and the stability of the children were at stake. Petitioner's Brief at 14–15 *citing* R. at 167, 180–181. However, we note that in *Dull v. Delaware County Department of Public Welfare* (1988), Ind.App., 521 N.E.2d 972, this court held that while a trial court may not terminate parental rights solely on the basis of the parent's mental retardation, the mental retardation was a factor to be considered among other factors. Here, there is no allegation that the Griffins are mentally retarded; however, their abilities, including intellect, as they relate to the parents' capacity to care for the children are factors which may be considered when a court determines whether the parental rights should be terminated. *Dull, supra.*

■ There was ample evidence to support the the trial court's findings of fact and conclusions of law based upon factors other than the Griffins' level of intellectual functioning. The evidence disclosed that from the beginning of the CHINS proceeding up to the hearing on the petition for termination, there was a pattern of conditions which had no sign of any long term improvement:

1. Frank had an alcohol abuse problem;

2. The parents had inadequate parenting skills;

3. The children all had very special needs which the parents appeared unable to deal with;

4. In the previous home, the children had been exposed to a variety of unsanitary conditions—including rat infestation. In the present home, there were holes in the ceiling, which apparently have been there for some time. On visits to the home, the children were exposed to spoiled food and parasites. Mary's housekeeping skills, which had shown improvement, have returned to what they were at the time of the CHINS filing.

The record demonstrates the Griffins have a pattern of unwillingness to deal with their problems and to cooperate with counselors and those providing social services. Therefore, we hold that the findings and conclusions of the trial court were supported by the evidence and that the findings supported the judgment of the trial court.

Accordingly, for all of the above reasons, we affirm the judgment of the trial court.

MILLER, J., concurs.

SHIELDS, P.J., concurs in result.