In the Matter of the Involuntary Termination of the Parent–Child Relationship of Christopher TUCKER and his Mother Sherri E. Tucker.

Sherri E. TUCKER, Appellant–Respondent,

v.

SHELBY COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee–Petitioner.

No. 73A04–9101–CV–23.

Court of Appeals of Indiana, Fourth District.

Sept. 30, 1991.

---

Robert D. Jones, Shelbyville, for appellant-respondent.

Jeffrey M. Linder, Shelbyville, Amy Good, Shelbyville, for appellee-petitioner.

CONOVER, Judge.

Respondent–Appellant Sherri E. Tucker appeals the trial court's judgment terminating her parental rights in her minor child, Christopher Tucker. The petition for termination was filed by the Shelby County Department of Public Welfare (DPW).

We affirm.

Tucker raises the following restated and consolidated issues for our review:

1. whether there was clear and convincing evidence to support termination of Sherri's parental rights;

2. whether the trial court's judgment violated Indiana statutes and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; and

3. whether termination of parental rights was in Christopher's best interest.

Sherri is the mother of two children, Christopher, born September 7, 1983, and Allen, a younger son. On August 22, 1989, the DPW filed a petition to terminate Sherri's parental rights in Christopher. The trial court granted the petition on October 8, 1990. In granting the petition, the trial court made specific findings of fact and conclusions of law. The pertinent factual findings are:

1. The child has been removed from his parent for a continuous period of at least six months under a dispositional decree of the Shelby Superior Court No. 1, dated January 11, 1989, Cause Number 73D01–8812–JC–26.

2. There is a reasonable probability that the conditions resulting in the removal of the child from the parent's home will not be remedied in that:

a. Mother cannot control the child's behavior.

b. Counseling services for mother are not helpful to change her behavior.

c. The mother is now separated and divorced from her husband thus reducing her financial and mental stability.

d. The mother is suffering from Mixed Personality Disorder and Borderline Personality Disorder which is chronic with a poor prognosis if in treatment. Medication is not appropriate.

e. This limits her ability to parent a child successfully.

f. The child was removed at the mother's request with the child displaying signs of self-abuse due to emotional upset.

g. The child improved in counseling and his developmental delays were improving.

h. Mother blamed the emotional upset in her life and marriage breakup on Christopher.

i. Child expressed no sense of loss over removal from mother indicating the lack of bonding between mother and child.

j. Counseling cannot resolve this mother-child relationship with the physical and emotional detachment being a long-standing problem.

k. The mother has a long history of counseling, medication and other contacts with mental health professionals. Her condition has worsened over time with little real improvement.

l. The mother exaggerates the child's misbehavior which was not observed in foster care.

m. The mother's visits with the child tended to focus on the mother's problems and not the child's concerns.

3. Termination is in the best interest of the child in that the mother's condition will not likely improve and she will continue to be unable to parent the child.

4. The county department of welfare has a satisfactory plan for the care and treatment of the child which is foster care and adoption. (R. 87–88).[1]

Sherri first contends the termination of her parental rights was not supported by clear and convincing evidence. She contends the evidence does not support the court's findings. She strongly contends the findings, even if accepted as true, do not support the judgment as a matter of law.

◼ In order to effect the termination of the parent-child relationship, the DPW must present clear and convincing evidence to support the elements of IND.CODE 31–6–5–4. *See, Matter of D.B.* (1990), Ind.

---

1. We read Finding 2(c) as an indicator of the level of instability in Sherri's home. The trial court was not saying termination was proper because Sherri was divorced and poor.

App., 561 N.E.2d 844, 847. IC 31–6–5–4 requires proof that:

(1) the child has been removed from the parent for at least six months under a dispositional decree;

(2) there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.[2]

■ On appeal of a termination of parental rights, this Court will not reweigh the evidence, nor judge the credibility of the witnesses. Rather, we will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. *Griffin v. Bartholomew County Dept. of Public Welfare* (1989), Ind.App., 542 N.E.2d 1385, 1388. Further, where the trial court enters findings of fact and conclusions of law, we apply a two-tier standard of review

... first, we will determine whether the evidence supports the findings; second, we will determine whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, that the record contains no fact or inferences supporting them. *Keystone Square v. Marsh Supermarkets, Inc.* (1984), Ind.App., 459 N.E.2d 420, 422.

*Id.*

The evidence presented at the termination hearing established that because of her tragic childhood, which included repeated beatings by her mother and sexual molestations by her father, Sherri developed severe mental disorders. Therapist Alfred Barrow of Campion and Associates, who conducted approximately fifty-five counseling sessions with Sherri, testified she has schizophrenic symptoms with strong paranoia, and she is unable to develop a close relationship with Christopher and unable to develop parental bonds. At times during the counseling period, Sherri showed signs of improvement, only to regress back to a crying, uncontrollable state in which she would become dirty and disheveled. When Christopher would be removed from her home, she would restabilize. Barrow also testified that it was just a matter of time before Christopher would begin to model Sherri's behavior by developing further emotional difficulties, depression, and neurotic characteristics.

Michael Parker, an employee of Gallahue Mental Health Center, testified that Sherri suffered from a Mixed Personality Disorder. He opined it was possible, but not probable, that Sherri would in the future be able to parent Christopher.

Susan Watson, a therapist who administered tests to Sherri, also testified Sherri's prognosis for mental health was very poor given the long-standing nature of the problem despite extensive counseling. Watson stated the only hope of recovery for Sherri would be years of inpatient treatment called "characterological transformation", a treatment plan with a very poor success rate.

David Esary, a pediatrician who examined Christopher and his medical records, testified the records indicated Sherri could have Munchausen's Syndrome by Proxy, a condition in which a mother operates under the delusion that seeking medical attention for a child is a positive indication of her parental abilities. This condition can be harmful to a child because it results in the parent giving the child too much medication.

Three times Sherri requested the DPW to place Christopher in foster care because she was unable to control his behavior. The first placement occurred from July, 1985, to February, 1986. Placement stemmed from an episode where a kitchen stove fell upon Christopher and injured him. After emergency technicians informed the DPW of the injury, a DPW county homemaker visited the home to investigate. She found Christopher, who

2. These are the requirements of the statute at the time of termination. The statute has since been amended.

was not yet two, running rampant through the house. Sherri claimed that Christopher was trying to kill her and the rest of the family, and she could not control him. Sherri also requested county wardship. After both Christopher and Allen were placed in foster care, the DPW set up counseling services, developed visitation schedules, and provided transportation for visits.

When the two children were returned to Sherri's care in February of 1986, DPW monitored Sherri's progress. Home visits revealed the kids were frequently medicated and in bed sleeping at odd times of the day. Even though DPW employees could detect no signs of illnesses, Sherri insisted on giving the children medicines such as Dimetapp and Co–Tylenol.

In March of 1986, about five weeks after the children were returned to her custody, a DPW employee visited the home and found Sherri shaking and crying and proclaiming that Christopher was uncontrollable. Sherri also claimed that Christopher had begun setting fires. She asked DPW to take custody of Christopher. During the time Christopher was in foster care, Sherri was allowed visitation with him in her home. During a number of the visits, Sherri gave medication to Christopher even though there were no indications of illness. Upon his return from visits with his mother, Christopher would exhibit self-abuse, such as biting himself and picking the skin off his nose until it became bloody.

Christopher was returned to Sherri's custody in March of 1987. In July of 1988, Christopher was accidentally given an overdose of Dilantin by Sherri.[3] The overdose required a visit to the hospital.

In November of 1988, Sherri took Christopher into the DPW's offices and insisted they again take wardship of Christopher. She again claimed he was uncontrollable. As she spoke, Christopher began biting himself, beating his head against the floor, and beating his face with his knees. Sherri insisted this behavior was a regular occurrence.

The DPW referred both Sherri and Christopher to counseling. Sherri told the therapist that Christopher set fires, was prone to tantrums and self-abuse, and that he was a "monster" who should be hospitalized. (R. 378–380). In a session with only the therapist and Christopher present, Christopher acted out aggressions by beating a "mother" doll and pretending to call the police on the mother.

On December 21, 1988, Christopher was once again placed in foster care. Again, Christopher and Sherri received counseling, Sherri attended parenting classes, and transportation services were provided.[4] Christopher's anger and wildness subsided, with reoccurrences after visits with his mother. He did not exhibit any self-abuse after being established in foster care.

The court's factual findings are clearly supported by the evidence presented at the termination hearing. The question of whether the findings support the judgment remains.

The time-honored right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070; *Meyer v. State of Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042. Children should not be removed from the custody of their parents just because there is a better place for them, but because the situation while in the custody of their parents is wholly inadequate for their very survival. *Matter of Miedl* (1981), Ind., 425 N.E.2d 137, 141; *J.K.C. v. Fountain County Dept. of Public Welfare* (1984), Ind.App., 470 N.E.2d 88, 93. This is a graduated yardstick according to which the particulars of a case must be measured. In so doing, the trial court must subordinate the interests of the parent to those

---

3. Dilantin was prescribed for Christopher's seizures.

4. Sherri complains that the parenting classes were ineffective because they were specifically geared to the parents of teenagers.

of the children involved. *J.K.C., supra.*[5]

Two recent Indiana cases have discussed the impact of mental limitations upon termination proceedings. In *Dull v. Delaware County Dept. of Public Welfare* (1988), Ind.App., 521 N.E.2d 972, *reh. denied,* a divided panel of this court affirmed the termination of parental rights of two mildly retarded parents who showed an inability to improve parenting skills. The parents' limitations resulted in severe behavioral and developmental difficulties in their two children. The court held the mental deficiencies of parents alone do not justify termination if there is no evidence of harm or possible future harm to the child(ren). However, the court further held that mental limitations may be considered as a factor if there are other reasons which would support the termination decision. *Id.,* at 976. The court also quoted from *In re J.L.B.* (1979), 182 Mont. 100, 594 P.2d 1127, 1136, to emphasize that in some cases the parents' inability to provide adequate emotional support is sufficient to warrant termination because the parents are "incompetent to handle the problems presented to parents by children in their advancing years." *Id.* In a dissent to *Dull,* Judge Sullivan contended termination was actually a prohibited value judgment that there was a "better" place for the children than their parents' home. He warned against encouragement of government interference in parental rights based solely on what social agencies and judicial systems deemed acceptable. 521 N.E.2d, at 977.

More recently, in *Egly v. Blackford County Dept. of Public Welfare* (1991), Ind.App., 575 N.E.2d 312, a divided panel of this court reversed the trial court's termination of parental rights of two mentally impaired parents on the basis the evidence of harm to their children was not clear and convincing. The majority noted the evidence established only that the children would be better off somewhere else, not that the children's survival was threatened. The majority also noted the Eglys, even

though mentally impaired, had shown they were capable of resolving problems with the assistance of DPW workers, family, and friends. The majority distinguished *Dull* on the basis the future survival of the children was threatened in *Dull.* Judge Baker dissented on the basis the majority was impermissibly reweighing the evidence. Judge Baker listed evidence which supported the judgment and noted there was no reason to wait until the children were further socially, emotionally, and intellectually disturbed before terminating parental rights.

This case is similar to *Dull* and *Egly* in that the Sherri's mental and emotional condition has resulted in emotional and developmental damage to her child. The case differs from *Egly,* however, in that the chance of Sherri ever resolving the problems which led to the damage to her child is virtually nonexistent.

■ This is not a case where the trial court terminated parental rights merely because it determined, as a representative of government, that Christopher would be simply "better off" in a more "acceptable" home. The trial court's determination was not based upon a "bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child." *Smith v. Organization of Foster Families for Equality & Reform* (1977), 431 U.S. 816, 97 S.Ct. 2094, 2105, 53 L.Ed.2d 14 (citing, Rein, Nutt & Weiss, *Foster Family Care: Myth and Reality, in Children and Decent People* 24, 25–29 (A Schorr ed. 1974)). Our examination of the record shows the trial court heard days of testimony by health care providers who testified that over a period of years Sherri could not give emotional support to Christopher, that she was unable to form any kind of bond with him, that he was prone to self-abuse while in her care, and that all attempts to improve the situation had failed. Furthermore, the trial court heard testimony that the situation would never change. This evidence supports the agon-

---

5. The best interests of the child determination is made after a determination of unfitness is made. The best interests determination is *not* an independent determination that the child is better off somewhere else.

izingly difficult decision by the trial court to terminate Sherri's parental rights.

Sherri contends termination of her parental rights by reason of her status is not authorized by IC 31–6–5–1 *et seq.* She further contends termination based upon status is only allowed under IC 31–3–1–6(g)(5).

 Sherri's contentions are based on the assumption her parental rights were terminated solely because of her mental illness. As discussed above, her mental illness was not the sole reason for termination. Therefore, we find termination under IC 31–6–5–1 *et seq.* was proper.

Sherri also contends termination was in violation of the equal protection clause of the United States Constitution. She contends the statute warrants termination based exclusively upon her classification as a mentally ill individual.

Indiana's termination statute, as interpreted by case law, does not allow termination simply on the basis of mental illness. It does not classify all mentally ill parents as unfit solely upon their status. Under the statute, as interpreted, mental illness is merely one factor to be considered by the court in its determination. *See, Dull,* at 976.[6]

Finally, Sherri contends the trial court erred in finding termination was in Christopher's best interest. She further contends the DPW's stated intent to place him for adoption is too vague.

Evidence presented at the termination hearing showed Christopher's emotional state improved dramatically when he was in foster care, and his abusive behavior disappeared. Evidence also established that foster care was the norm for him because of Sherri's inability to raise him. Termination provides him with a chance for permanent placement. This evidence is sufficient to support the court's finding that the DPW's plan is acceptable. Furthermore, the DPW is not required to designate the specific home to which Chris-

topher will be placed. *See, Miedl, supra,* at 141; *J.K.C., supra,* at 93.

Affirmed.

CHEZEM and BUCHANAN, JJ., concur.

---

**6.** *See also,* Annotation, *Validity Of State Statute Providing For Termination Of Parental Rights,* 22 A.L.R.4th 774 (1983).