# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 22 2015, 6:45 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| --- | --- |
| Harold E. Amstutz<br>Lafayette, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Robert J. Henke<br>Deputy Attorney General<br><br>James D. Boyer<br>Deputy Attorney General<br>Indianapolis, Indiana |

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| In the Matter of the Termination of the Parent-Child Relationship of:  A.G., | April 22, 2015 |
| | Court of Appeals Case No. 79A02-1410-JT-701 |
| M.G., | |
| *Appellant-Respondent,* | Appeal from the Tippecanoe Superior Court |
| v. | The Honorable Faith Graham, Judge |
| Indiana Department of Child Services, | Cause No. 79D03-1311-JT-62 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

## Statement of the Case

M.G. ("Mother") appeals the termination of her parental rights over her minor child, A.G. ("Child").[1] Mother presents five issues for our review, which we revise and restate as one issue, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of her parental rights.

We affirm.

## Facts and Procedural History

Mother lives in Chicago, Illinois and suffers from schizoaffective disorder, for which she is prescribed medication. However, around the beginning of June 2012, Mother ran out of medication, and, over the course of several weeks, her mental health deteriorated rapidly. On June 3, Mother disappeared with Child from her home in Chicago, which they shared with Child's father, I.H. ("Father"), and Mother and Child were missing for two days before returning home. During the time she was missing, Mother had called Father to report that she was lost. Around the same time, Mother also threw away all of the food in the home[2] because she believed the food was "bewitched." Exh. 2.

---

[1] Child's father does not participate in this appeal.

[2] Mother and Father, who have never been married, have since terminated their relationship.

[4] On June 8, Mother again disappeared from her home in Chicago. Two days later, on June 10, Mother contacted her sister, L.D.R., who lived in Tippecanoe County but was visiting Chicago, and asked L.D.R. to take her and Child to Tippecanoe County. Mother reported to L.D.R. that she needed to escape Father's domestic violence. Mother stayed with L.D.R. the night of June 10, but, on the morning of June 11, Mother accused L.D.R. of stealing Child's clothes and fled the residence with Child. L.D.R. filed a missing-person's report for Mother. The Tippecanoe County Sheriff's Department located Mother and brought her and Child to a local women's shelter.

[5] The next day, June 12, the Lafayette Police Department ("LPD") received a call from the women's shelter, which reported that Mother was being belligerent, aggressive, demanding, uncooperative, and verbally abusive to staff. As a result, the women's shelter had asked Mother to leave. Officers with LPD responded to the shelter and, on their way, contacted Rosa Banuelos,[3] an assessment worker at DCS.

[6] When Banuelos arrived at the shelter, Mother refused to return to L.D.R.'s home and lacked other accommodations in Tippecanoe County. Thus, Mother requested money from Banuelos to return to Chicago. When Banuelos refused, Mother requested that Banuelos call Mother's godmother for money, but the

---

[3] L.D.R. had also contacted Banuelos prior to contacting the LPD. In 2011, Banuelos had been involved in the dissolution of a guardianship over Mother's other child, E.G, in which L.D.R. had been E.G.'s custodian.

godmother could not help Mother. As a result, Mother became agitated and afraid, and Banuelos determined that DCS needed to remove Child from Mother's care. To remove Child from Mother, officers had to physically restrain Mother and "pr[y] her hands away from [Child]." Tr. at 22. LPD officers did not arrest Mother but, instead, transported her to River Bend Hospital, where she was involuntarily committed for treatment of her mental illness. When these events unfolded, Mother's other child, E.G., who was then sixteen years old, was staying with a relative in Merrillville "to get away from the stress of [Mother's] home environment." *Id.* at 28.

[7] As a result of these events, DCS filed a petition alleging that Child and E.G.[4] were children in need of services ("CHINS"), and, on July 24, the trial court adjudicated Child a CHINS. Child was placed in the care of L.D.R., her maternal aunt, for the duration of the CHINS proceeding. L.D.R. also had received custody of E.G. in a 2002 CHINS proceeding, which arose as a result of Mother's deteriorated mental health. That CHINS proceeding concluded in the creation of a guardianship and in the long-term placement of E.G. in L.D.R.'s home. In 2011, however, Mother demonstrated stability to DCS, and the guardianship was dissolved. Consequently, E.G. was placed back in Mother's care.

---

[4] E.G turned eighteen years old before the final disposition in this case and is not subject to this appeal.

[8] In August 2012, the trial court entered its participation decree, which ordered Mother to complete a parenting assessment, parenting classes, case management, a domestic violence assessment, and domestic violence classes; maintain medication management and a treatment regimen, including individual therapy; and participate in visitations. Mother did not begin services and returned to Chicago. Soon thereafter, in September, Mother flew to Mexico to care for her mother, who was ill. Mother stayed in Mexico[5] until November and then returned to Chicago, where she began some, but not all, of the ordered services. Mother began case management, medication management,[6] and visitation, all of which she attended consistently, with few absences, for the remainder of her case. However, because Mother participated in medication management in Chicago, DCS was unable to confirm that Mother was actually complying with her treatment regimen, which included taking her medication. DCS also did not have the opportunity to observe Mother's home.

[9] DCS refused to offer visitation in Chicago, so Mother consistently traveled to Tippecanoe County to see Child, who continued to live with L.D.R. Mother traveled to Tippecanoe County approximately every other week, staying two to three days each time, and she would visit with Child several hours each day. Aside from one instance where Mother, against DCS policy, let Child use her

---

[5] According to Mother, she saw a psychiatrist while in Mexico.

[6] The program Mother selected referred to medication management as "medication education." Tr. at 55.

phone to talk to Father, who never involved himself in the case, visitations went well and were appropriate.

[10] For the majority of Mother's case, Mother's relationship with DCS, however, was tumultuous. Her insistence on completing services in Chicago provided a source of constant conflict, especially after Mother had refused services in Lake County, which is only about six miles from Mom's home in Chicago. Further, Mother's case manager, Taylor Fristoe, found Mother difficult to work with, and her conversations with Mother frequently devolved into arguments because Mother did not believe she needed the offered services. Consequently, in October 2013, both DCS and Child's court-appointed special advocate ("CASA") recommended the termination of Mother's parental rights over Child and the adoption of Child by L.D.R. as Child's permanency plan.

[11] However, in late 2013, Mother's attitude towards DCS changed markedly. Mother began cooperating with providers, and she enrolled in the services that she previously had refused. In addition to continuing her other services, Mother begstarted individual therapy in December 2013, domestic violence classes in January 2014, and parenting classes in March 2014. Mother's compliance persuaded Child's CASA, in February, to recommend a guardianship over Child in lieu of terminating Mother's parental rights. DCS, however, continued to recommend termination but was receptive to the idea of a guardianship. All parties agreed that if Mother continued to control her mental illness, she could be a fit parent. However, DCS expressed concern that

Mother's history established a pattern of conduct demonstrating her inability to consistently tend to her mental health.

[12]  The trial court held the termination hearing on March 14, 2014. At the hearing, Mother interrupted the testimony of Fristoe and, despite repeated attempts by the court to quiet her, Mother shouted, "She don't have experience in her job. She don't have no kids." *Id.* at 89. And, shortly thereafter during a recess from the proceedings, Mother told Fristoe not to call her directly but to call her lawyer if she needed to talk. On cross-examination, Mother explained that she had made her comments because "[Fristoe] was lying a lot, [Fristoe] doesn't have experience with DCS cases, [and Fristoe] doesn't have any children." *Id.* at 166. Later, on July 7, the trial court agreed to reopen evidence, and Mother introduced exhibits that demonstrated her continuation of services, including the completion of her domestic violence classes. Two days later, however, the trial court terminated Mother's parental rights over Child. In relevant part, and in addition to the above facts, the trial court found and concluded:

FINDINGS OF FACT

* * *

16.  Mother has generally maintained employment and reportedly maintained housing. Mother is currently residing in a two (2) bedroom apartment in Chicago that is reportedly appropriate for a child. . . . Mother reports she is current on rent and utilities and does not receive public assistance benefits. Mother does not have a driver's license or a vehicle.

* * *

19.  Attempts to engage Mother i[n] ordered services have been problematic due to Mother becoming argumentative.  Mother repeatedly declares she does not need services and does not understand why she is required to participate in services.  Mother's outburst during the termination proceeding is typical of interactions with Mother throughout the court of the CHINS case.

20.  Since July 2012, Mother has attended only six (6) therapy appointments commencing in December 2013.  Mother's explanation for delaying therapy is an inability to locate a therapist because a medical card was required.  Mother offers the same explanation for the delay in commencing a parenting class and domestic violence services.  Mother failed to commence domestic violence classes until January 2014 and failed to commence parenting classes until March 2014.  Mother missed therapy appointments as recently as February 2014.

21.  Mother has demonstrated a long-term[,] historical inability to consistently maintain her mental health.  Mother is diagnosed with Schizoaffective Disorder.  Mother's mental stability is the core issue and medication management is the priority service for Mother.  Mother reports an understanding that she must remain treatment compliant to manage her mental health diagnosis and acknowledges her diagnosis is controlled if she takes her medication and attends therapy.  Mother admits she stopped taking medication and ceased treatment prior to the onset of the [present] CHINS case.

* * *

24.  CASA, Tom Newett, noted that Mother has participated in a treatment [regimen] for approximately three (3) months after approximately two (2) years of non-compliance.  CASA has observed a recent change in Mother's disposition, demeanor, and

approach to the CHINS case. The relationship between Mother and relative placement is also more conciliatory.

25. [Child] is developmentally and educationally on target. [Child] responds well behaviorally to stability and a clear routine in the relative home. The relationship between [Child] and the relatives appears to be parental in nature. The relative placement is readily willing to adopt [Child]. [Child] is bonded to [sic] and doing very well in the concurrent [sic] relative placement.

26. . . . Mother was unwilling to consent to a guardianship until the termination proceeding commenced. CASA believes guardianship may be in the best interests of [Child]. DCS, however, does not share that opinion given Mother's history of struggling with her mental health diagnoses over the course of more than a dozen years.[7]

27. Mother's historical mental instability has negatively affected both of her children. [Child] is only six (6) years of age and requires appropriate adult supervision to meet her needs. [Child] is thriving in a routine, structured environment knowing where she will sleep each night.

28. It is likely that Mother's pattern of repetitive failure to maintain treatment compliance will continue. As such, Mother's ongoing willingness to accept a guardianship without constant disruption is suspect. Anything less than a permanent adoption is likely to disrupt [Child's] long-term stability and negatively impact [Child's] need for permanency.

29. . . . [N]either [parent] has the ability to meet [Child's] needs. All imaginable services have been offered and nothing is substantially different in today's circumstances since the time of

---

[7] Internal paragraph structure omitted.

removal. To continue the parent-child relationship would be detrimental to [Child]. [Child] needs permanency now.

CONCLUSIONS OF LAW

1. There is a reasonable probability that the conditions that resulted in the removal of [Child] from [Mother's] care or the reasons for continued placement outside [of] the home will not be remedied. [Mother] has yet to demonstrate the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that [Mother] will be able to maintain stability in order to care and provide adequately for [Child].

2. Continuation of the parent-child relationship poses a threat to the well-being of [Child]. [Child] needs stability in life. [Child] needs parents with whom [Child] can form a permanent and lasting bond to provide for [Child's] emotional and psychological as well as physical well-being. [Child's] well-being would be threatened by keeping [Child] in [a] parent-child relationship where [Mother's] own choices and actions have made [her] unable to meet the needs of [Child].

3. DCS has a satisfactory plan of adoption for the care and treatment of [Child] following termination of parental rights. [Child] can be adopted and there is reason to believe an appropriate permanent home has or can be found for [Child] with a relative.

4. For the foregoing reasons, it is in the best interests of [Child] that the parental rights of [Mother] . . . be terminated.

Appellant's App. at 20-24. This appeal ensued.

# Discussion and Decision

Mother contends that the trial court erred when it terminated her parental rights. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, in relevant part, DCS is required to allege and prove:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * *
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). That statute provides that DCS need establish only one of the requirements of section (b)(2)(B) before the trial court may terminate parental rights. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[15] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.

*Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[16] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[17] Mother presents several arguments for our consideration. First, Mother contends that the trial court erred when it determined that a reasonable probability that the conditions that resulted in Child's removal or the reasons for continued placement outside of her home will not be remedied. Second, Mother asserts that the trial court erred when it determined that the continuation of the parent-child relationship posed a threat to the well-being Child. Third, Mother argues that the trial court erred when it determined that termination was in the best interests of Child. Fourth and finally, Mother contends that the trial erred when it determined that adoption was a satisfactory permanency plan. In contrast to what the trial court concluded, Mother asserts that the trial court terminated her parental rights solely because of her mental

illness. Moreover, she maintains, the creation of a guardianship was a more appropriate permanency plan and, therefore, in Child's best interests.

[18] Because Indiana Code Section 31-35-2-4(b) is written in the disjunctive, "DCS was required to allege and prove only one of the enumerated elements." *Karma W. v. Marion Cnty Dept. of Child Servs. (In re B.J.)*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008). Thus, with respect to Mother's arguments regarding Section 4(b), we address only the trial court's conclusion that the conditions that resulted in Child's removal or the reasons for placement outside the home of the parents will not be remedied. We then consider Mother's contention that the trial court terminated her parental rights solely because of her mental illness. And, finally, we attend to Mother's respective assertions that Child's best interests are better served by a guardianship, which she regards as a superior permanency plan.

### Reasons for Removal

[19] Mother first contends that the trial court erred when it concluded that the conditions that resulted in the removal of Child from her care or the reasons for the continued placement of Child outside of Mother's home will not be remedied. Here, "[w]e engage in a two-step analysis . . . . First, we must ascertain what conditions led to their placement and retention in [relative] care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *K.T.K v. Ind. Dep't of Child Servs., Dearborn Cnty. Ofc.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (citations and quotation marks omitted). In reaching its conclusion, "the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial

probability of future neglect or deprivation." *Id.* (citations and quotation marks omitted). However, "it is within the province of the trial court, as the finder of fact, to ignore or discredit evidence of remedial efforts made shortly before the termination hearing." *Id.* at 1234 (quoting *McKinney v. Green Cnty. Ofc. of Family & Children (In re C.M.)*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997) (quotation marks omitted).

[20] Mother premises her argument on the fact that she had engaged in all court-ordered services—and even completed domestic violence classes—by the time the trial court terminated her parental rights. However, while Mother's statements are factually accurate, to accept Mother's argument would require us to reweigh the evidence, which we will not do.

[21] The evidence before the trial court, viewed in a manner most favorable to the court's judgment, demonstrated that, in 2002, E.G. was adjudicated a CHINS as a result of Mother's deteriorated mental health and, ultimately, placed into a guardianship with L.D.R., which was dissolved in 2011. Less than a year later, Mother's mental health again deteriorated, which resulted in the current CHINS action and the placement of Child and E.G. into L.D.R.'s care. Both times Mother's mental health regressed, the evidence established that Mother had fled her home with Child and ultimately had ended up without shelter. Further, after Child's CHINS adjudication, Mother did not begin any of the services ordered by the trial court for a number of months, and, even when she did start services, she did not engage in all of them. Instead, Mother was argumentative towards DCS until December 2013, and she had not complied

with all services until March 2014, just a few weeks before her termination hearing. As a result, Child continued to remain outside of Mother's care until the termination hearing, at which Mother interrupted the testimony of Case Manager Fristoe, criticized Fristoe's work product, and told Fristoe that Fristoe could no longer contact her directly.

Thus, although it is true, as Mother points out, that Mother had complied with her ordered services for several months before termination, the trial court was free to give that evidence little, if any, weight. *Id.* Indeed, given the fact that Mother's mental health problems occasioned both CHINS proceedings, the long period of time that Mother failed to comply with ordered services, and Mother's conduct at the termination hearing, the court could reasonably conclude that the conditions that resulted in the removal of Child from Mother's care or the reasons for the continued placement of Child outside of her home would not be remedied. Therefore, the trial court's judgment is not clearly erroneous in this respect.

### *Mental Illness*

Despite the evidence chronicled above, Mother nevertheless contends that the trial court terminated her parental rights solely because of her mental health, which would make the court's judgment clearly erroneous as a matter of law. *See, e.g.*, *Tucker v. Shelby Cnty. Dep't of Pub. Welfare (In re Tucker)*, 578 N.E.2d 774, 780 (Ind. Ct. App. 1991), *trans. denied.* Mental illness is, however, a factor that the trial court can consider. *E.g.*, *id.* But the court did not terminate Mother's parental rights *solely* because of her mental illness. Instead, it

terminated Mother's parental rights because of the impact Mother's mental illness has had on her ability to parent Child. Specifically, the trial court found Mother did not "have the ability to meet [Child's] needs," which jeopardized Child's need for permanency and stability, thereby also threatening Child's well-being. Appellant's App. at 23. Again, Mother asks that we reweigh the evidence, which we will not do.

### Child's Best Interests and Child's Permanency Plan

[24] Indiana Code Section 31-35-2-4(b)(2) also requires that termination of the parent-child relationship be in the best interests of the child, *see* I.C. § 31-35-2-4(b)(2)(C). Mother's argument regarding Child's best interests substantially overlaps with her argument regarding Child's permanency plan, and, thus, we address them together. In essence, Mother contends that the trial court erred when it concluded that the relative adoption of Child by L.D.R. was a satisfactory plan under Indiana Code Section 31-35-2-4(b)(2)(D) because "the proposed Guardianship plan with the relative placement was a more appropriate plan for [Child]." Appellant's Br. at 20. Further, "DCS [sic] ignores the long[-]term impact that adoption might have on [Child]. The DCS [sic] ignores the evidence that not all adoptions end up 'happily ever after.'" *Id.* at 17. As such, Mother reasons that a guardianship, which Child's CASA recommended in lieu of adoption, was in Child's best interests. We cannot agree.

[25] As the phrasing of Mother's permanency argument suggests, she requests that we reweigh the evidence. Indeed, Mother cites no authority for her argument

on appeal, and she fails to support her argument with cogent reasoning. Thus, Mother has waived this argument for appeal. Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, however, the trial court's conclusion that relative adoption of Child by L.D.R. constituted a satisfactory permanency plan is not clearly erroneous.

[26]     As we have stated:

> Indiana courts have traditionally held that for a plan to be satisfactory, for the purposes of the termination statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children. Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate.

*In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (emphasis added; citations and quotation marks omitted), *trans. denied*. Here, DCS identified an adoptive parent that the trial court found to be suitable. The trial court, therefore, did not err when it approved the relative adoption of Child.

[27]     Mother's argument that a guardianship, not an adoption, was in Child's best interests also amounts to a request that we reweigh the evidence, but, again, that prerogative belongs to the trial court. The court was "required to look

beyond the factors identified by DCS and consider the totality of the evidence. In so doing, the trial court must [have] subordinated the interests of the parent to those of the child." *In re C.A.*, 15 N.E.3d 85, 94 (Ind. Ct. App. 2014). A trial court should consider the recommendations of the case manager and court-appointed advocate when it determines whether termination is in a child's best interest. *See S.C. v. Ind. Dep't of Child Servs. (In re J.C.)*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). "A parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." *Id.*

[28] Mother asks us to give more weight to the CASA's suggestion that a guardianship would be in the best interests of Child than did the trial court. But the trial court weighed the evidence and determined that termination and adoption, as proposed by DCS, was in Child's best interests. We have already held that the trial court did not err when it concluded that the reasons that led to Child's removal from—and continued placement out of—Mother's home were not likely to be remedied and that a relative adoption was a satisfactory permanency plan. Therefore, for all the reasons stated, this conclusion was not clearly erroneous, and the trial court did not err when it terminated Mother's parental rights.

[29] Affirmed.

[30] Baker, J., and Friedlander, J., concur.