Carol SHAW and Ralph Rouse, Sr.,
Appellants–Respondents Below,

v.

**SHELBY COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee– Petitioners Below.**

**No. 73A05–9108–JV–268.[1]**

Court of Appeals of Indiana,
Third District.

Jan. 21, 1992.

---

1. This case has been diverted to this office by order of the Chief Judge.

R. Kent Apsley, Robison, Lux & Apsley, P.A., Shelbyville, Robert J. Arnold, Matchett & Arnold, Shelbyville, for appellants.

Dennis E. Harrold, Bate, Harrold & Meltzer, Shelbyville, for appellee.

STATON, Judge.

Ralph Rouse and Carol Shaw appeal the involuntary termination of the parent-child relationship between themselves and their child R.R. The parents present two (restated) issues for our review:

I. Whether clear and convincing evidence exists to support the trial court's determination that:

(a) there is a reasonable probability that the conditions which resulted in the child's removal from the home will not be remedied;

(b) the termination of the parent-child relationship is in the best interests of R.R.; and

(c) the Shelby County Department of Public Welfare has a satisfactory plan for the care and treatment of R.R.

II. Whether the trial court's order violated the parents' fundamental con-

stitutional right to direct their child's upbringing?

We affirm.

R.R., born May 2, 1980, is the eldest of three children born out-of-wedlock to Ralph Rouse and Carol Shaw. The history of the family's involvement with the Shelby County Department of Public Welfare ("DPW") began on February 22, 1982.[2] On that date, the parents advised a DPW caseworker that they lacked food and shelter for their children.[3]

R.R. was thrice declared to be a child in need of services; dispositional orders were issued on April 20, 1982, July 21, 1986 and December 20, 1988. The DPW made numerous services available to the family in an attempt to assist the parents to maintain a stable interpersonal relationship and provide their children with adequate housing, hygenic care, nutrition and supervision.[4]

During November 1988, R.R. was placed in Delta Treatment Center ("Delta"), a residential home for children with emotional difficulties. However, R.R.'s mental health did not improve as anticipated. Eventually, parental visits were discontinued at the instance of R.R. and R.R.'s primary therapist.

On December 21, 1989, the DPW filed its petition for the involuntary termination of the parent-child relationship between R.R. and his parents. Following an evidentiary hearing held February 6, 1991, at which both parents appeared in person and by counsel, the petition for termination was granted. This appeal ensued.

## I.

### Sufficiency of the Evidence

■ To effect the involuntary termination of a parent-child relationship, the DPW must present clear and convincing evidence to establish each element of IND. CODE 31–6–5–4(c). *In the Matter of Tucker* (1991), Ind.App., 578 N.E.2d 774, 776. I.C. 31–6–5–4(c), as it existed at the time of the instant action, required proof that:

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

---

**2.** The record discloses that the family had previously received the assistance of a public welfare agency in the state of New Jersey. When the parents moved to Indiana, one of their children remained in foster care in New Jersey. The parent-child relationship between Rouse, Shaw, and their middle child was subsequently terminated by a New Jersey court order. The youngest child of Rouse and Shaw (C.S.) was not named in the instant termination petition.

**3.** The record discloses that Shaw was often unemployed. Rouse, age 69 at the time of the instant proceeding, retired upon relocating to the State of Indiana.

**4.** Services made available to the parents included:

Foster home placement;
Parenting classes (six sessions);
Referral to Comprehensive Employment and Training Act Program;
Referral to, and liaison with, mental health counselor Al Barrows;
Referral to Infant Stimulation Program;
Referral to, and liaison with, the Salvation Army;
Referral to, and liaison with, Charlie Brown Preschool for developmentally delayed children;
Referral to Gallahue Mental Health Center;
Referral to Family Services Association;
Participation in the Project Team;
Participation in the Child Protection Team;
Liaison with Gallahue Mental Health Center, Shares, Inc., and Charlie Brown Center;
Liaison with Shelby County Schools;
Referral to Shelby County Health Nurse;
Referral to Dr. Terry Parrish, M.D.;
Liaison with Anne Dahm, Gallahue Mental Health Center therapist;
Liaison with Bright–Way and Semi Independent Living Program, Department of Mental Health;
Various employment referrals;
Development of Informal Adjustment Programs;
Transportation to visitation sessions, health and counseling appointments, school;
Referral to, and liaison with, Lee Hamlin, Visiting Nurse Service counselor;
Participation in school case conferences;
Liaison with Dr. Rich Jones, Gallahue Mental Health Center psychologist;
Referral to, and liaison with, Community North Hospital Children's Psychiatric Unit;
Liaison with Delta Treatment Center;
Referral to Dr. Jagdish Kulkarni, psychiatrist at Valle Vista Guidance Center;
Liaison with Marilyn Griffith, MSW, clinical social worker at Gallahue Mental Health Center;
Liaison with Dolly Greer, Visiting Nurse Service;
Referral to Occupational Development Center;
Housing assistance;
Referral to Community Incentives, Inc.;
Assistance to Dr. Robert Pearce in conducting family evaluation.
Record, p. 448.

(2) there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) termination is in the best interests of the child; and

(4) the county department has a satisfactory plan for the care and treatment of the child.

Rouse and Shaw challenge the sufficiency of the evidence offered to establish the latter three elements.

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. We will consider only the evidence and reasonable inferences therefrom which are most favorable to the judgment. Where the trial court has entered findings of fact and conclusions of law, we engage in a two-tier standard of review. First, we determine whether the evidence supports the findings; second, we determine whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *In the Matter of M.J.G.* (1989), Ind. App., 542 N.E.2d 1385, 1388.

The trial court's extensive findings of fact included findings that R.R. was self-abusive, physically aggressive toward others and in need of greater structure and consistency than a child without such problems. The court found that R.R.'s parents had demonstrated a pattern of making only temporary changes in their home environment, had failed to cooperate with the DPW during the provision of multiple services, and had exhibited uncooperative and dishonest behavior during R.R.'s placement at Delta.

Concerning the statutorily mandated plan for R.R.'s care and treatment, the court found that the DPW plan consisted of continued placement and treatment at Delta, followed by placement in an appropriate adoptive home. Findings of fact were also made with respect to the recommendations of Dr. Robert Pearce, a court-appointed psychiatrist, and Mary Williams, R.R.'s Guardian Ad Litem:

18. During September, October and November of 1990, at the request of the parents, Carol, Ralph and [R.R.] were examined by a qualified psychiatrist, Robert M. Pearce, M.D., who concluded that [R.R.] should not return to the custody and care of his natural parents.

20. Ralph is 69 years old and has very little apparent capacity to set or maintain effective behavioral limits when children do not respond in a positive way or when problems or difficulties occur. He is not likely to make significant changes in personality in his overall way of dealing with [R.R.] in the remaining years of his life. His relationship with Carol has been distant and inconsistent.

21. Carol spent the bulk of her childhood with foster parents, and her experiences have prevented her from forming a very solid self-concept and from developing the ability to form and maintain a long term meaningful relationship with others. She is limited intellectually, impulsive, and emotionally volatile at times. Although she has a strong positive attachment to [R.R.], she has little appreciation for the needs of children in terms of effective, consistent setting of limits, and appropriate responses to their behavior when it does not meet her expectations. Her personality characteristics based on her life experiences have had an adverse affect on her ability to be an effective parent. She does not have the ability to change enough during the remainder of [R.R.'s] childhood to allow her to be an effective parent to him.

22. Because of [R.R.'s] special needs, he would be a very difficult child for any parent to manage under the best of circumstances. Carol and Ralph, as his parents, have not demonstrated an ability, over a long period of time, to consistently and effectively meet [R.R.'s] needs for a consistent, structured, effective environment. This has occurred despite considerable professional assistance. Carol and Ralph's deficiencies exist in exactly the areas where [R.R.] has the greatest needs. Carol and Ralph's problems as parents are not amenable to therapy or to change during the remainder of [R.R.'s] childhood.

27. Mary Pat Williams, Guardian Ad Litem for [R.R.] concludes that the parents are likable people who often have good intentions, but who are unable to meet [R.R.'s] needs. She further concludes that it is in the best interest of [R.R.] that the parent-child relationship between him and his parents be terminated so that he will know what his future holds.

Record, pp. 175–180.

Our review of the record herein discloses evidentiary support for the findings of the trial court and its conclusion that each requirement of I.C. 31-6-5-4(c) was satisfied.

Denny Ramsey, the principal of R.R.'s elementary school, testified that he had contacted R.R.'s parents many times to discuss R.R.'s academic performance, hygiene, and classroom behavior. He indicated that the parents appeared cooperative, but failed to "follow through" with the parent/teacher plans.

Ramsey testified that R.R.'s behavioral difficulties increased despite placement in a class for emotionally handicapped children. R.R. would engage in violent outbursts, use foul language and physically abuse himself, other children, and school personnel. R.R. was often placed in a "time-out" room; he responded by screaming, kicking and urinating on the floor. Several times, R.R. threatened to kill himself.

On October 24, 1988, Ramsey was called to R.R.'s classroom after R.R. attempted to strangle himself, first by using a shoestring and then by using his shirt. R.R., who was "turning a bit blue," was transported by ambulance to a hospital. Record, p. 227.

Brier Frasier, R.R.'s primary therapist at Delta (where R.R. was placed immediately upon his release from the hospital), testified that R.R. hurt himself and others, threatened to kill himself and others, and "acted out" sexually.[5] Record, pp. 245–46.

Frasier indicated that the cooperation of R.R.'s parents in meeting treatment goals had been "very inconsistent." Record, p. 253. She indicated that R.R.'s supervised in-home visits had ranged from positive to chaotic and volatile. Record, p. 258. During one in-home visit, Rouse threatened and swore at Frasier.

After one unsupervised overnight visit, R.R. reported to Frasier that he and his sister engaged in sexual play, Rouse had sworn at the children, and Shaw had physically disciplined C.S. (despite an agreement with Delta that no physical discipline would be used in the home). The parents initially reported that there were no problems during this visit, but later indicated that they had cautioned R.R. not to report the foregoing incidents. Treatment summaries compiled by Frasier and admitted into evidence without objection disclosed that R.R. reported fearfulness for his and his sister's safety in his parents' home.

Frasier testified that R.R. was a difficult child to deal with despite her specialized training. She expressed an opinion that R.R.'s parents were unable to provide the intensive care needed by R.R.: "Their history while [R.R.] has been at Delta has not shown that they have been capable of providing for him. They have shown a willingness to do so at time[s], but have not shown a capability to do so." Record, p. 268.

Dr. Robert Pearce (whose court-ordered report was admitted as substantive evidence pursuant to the parties' stipulation) concluded that R.R.'s parents had not demonstrated an ability over a long period of time to consistently and effectively meet [R.R.'s] needs for a consistent, structured, effective environment, despite considerable professional assistance. He recommended that R.R. not be returned to the custody and care of his natural parents.

---

**5.** Examples of this behavior are detailed in Petitioner's Exhibit 12: "Prior to restraint, [R.R.] pulled his pants down, held onto his penis saying, 'Here it is, I know you want it, you might as well take it.'" Record, p. 447. "[R.R.] pulled down his pants on the school bus and made sexual gestures and statements about the driver. [R.R.] said that he is 'afraid of his home and what would happen to him by his dad.' he went on to say he was afraid he would be sexually abused on his home visit." Record, p. 447.

Peggy Faulk, a DPW caseworker, testified that the DPW had offered services to R.R.'s family for a period of nine years without successful permanent reunification of the family. She indicated that the DPW had previously worked toward reunification of Rouse and R.R. (subsequent to one of the parents' numerous separations and the issuance of a no-contact court order involving Shaw and C.S.). However, Rouse later informed Faulk that he did not desire the physical custody of R.R.[6] Faulk testified that the DPW planned to place R.R. in an adoptive home after providing the adoptive parents with special training through cooperation with Delta.

Rouse admitted that he had failed to call R.R. at Delta for an extended period of time because he was angry and frustrated with the welfare system. However, he felt that he could work with the welfare department and Delta to obtain custody of his son "as long as they don't send them [caseworkers] down every day but [sic] my house …" Record, p. 359.

Shaw testified that she was unable to economically provide for her children or care for them on a full-time basis. However, she was willing to assist Rouse with child care responsibilities should he be granted custody of R.R.

Additional evidence before the trial court indicated that each parent had permitted overnight guests in his or her home in violation of agreements adopted with the objective of protecting R.R. and C.S. from sexual abuse. (According to DPW records admitted into evidence, R.R. reported that he was sexually abused by Rouse's acquaintance and that C.S. was sexually abused by Rouse. Various incidents of physical abuse by both parents were also reported to the DPW and/or school personnel by R.R.). DPW records also indicated that Shaw had been terminated from various assistance programs because of noncompliance with requirements.

The parents argue that the termination of parental rights can not be ordered sim-

ply because others may deal more appropriately with R.R.'s emotional problems. They rely upon the opinion of our supreme court in *In the Matter of Miedl* (1981), Ind., 425 N.E.2d 137, wherein the court stated that a child is not removed from his natural parents' home because there is a "better" place for the child, but because conditions in the parental home are "wholly inadequate for the very survival of the child." *Id.* at 141. The parents claim that continuation of their relationship with R.R. would pose no danger to him.

■ The parents correctly assert that children are to be removed from the custody of their parents only where the situation while in the custody of their parents is wholly inadequate for their very survival. However, this is a graduated yardstick against which the particular circumstances in a case must be measured. *In the Matter of D.B.* (1990), Ind.App., 561 N.E.2d 844, 847. In evaluating these circumstances, the trial court must subordinate the interests of the parents to those of the child. *Id.*

■ Here, the evidence before the trial court showed a pattern of unwillingness or inability of the parents to deal with the specialized needs of R.R., who presented a threat to himself and to others. The trial court appropriately considered the parents' habitual patterns of conduct in assessing the probability of future neglect or deprivation of R.R. in the parental home. The circumstances of the instant case are very similar to those before the court in *Miedl, supra.* In *Miedl,* a termination of parental rights was affirmed where the parent, despite "good intentions," was unable to provide adequate care to her children even after the governmental agencies involved had "gone the second mile" to assist her. *Id.* at 141. Clearly, the DPW has "gone the second mile" to assist Rouse and Shaw, having offered approximately thirty services over the course of a decade.

---

**6.** DPW records admitted into evidence indicate that Rouse had assumed the physical custody of his children during one parental separation, but had subsequently returned the children to Shaw and expressed his unwillingness to care for them. Record, p. 447.

The record is replete with evidence that the parents failed to protect R.R. in the past and would be unable to do so in the future. The trial court's findings concerning R.R.'s best interests and the probability of change in the parental home have ample evidentiary support. Moreover, the record discloses evidence in support of the trial court's finding that the DPW had devised an adequate plan for R.R.'s care and treatment. The DPW had no obligation to present evidence of a specific adoptive home demonstrably superior to the natural parents' home. *Id.*

Having concluded that the trial court's factual findings have evidentiary support, we next consider whether the findings support the judgment. The findings of the trial court indicate that R.R. was removed from his parents at least six months under a dispositional decree, there exists a reasonable probability that the conditions resulting in his removal will not be remedied, termination is in R.R.'s best interests, and the DPW has a satisfactory plan for R.R.'s care and treatment. Each element of I.C. 31–6–5–4(c) is established by clear and convincing evidence. Therefore, the judgment terminating the relationship between R.R. and his parents is supported by sufficient evidence.

## II.

### Constitutionality of the Judgment

The parents argue that the judgment entered by the trial court violated their fundamental constitutional rights. They contend that the termination of their parental rights occurred solely because they are emotionally, physically and educationally limited. They insist that the circumstances giving rise to R.R.'s removal from the home are not attributable to them.

█ The time-honored right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Tucker, supra,* at 778 (quoting *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070; *Meyer v. State of Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042). However, these parental interests are not absolute and must be subordinated to the child's interest in determining an appropriate disposition of a petition to terminate parental rights. *In the Matter of Perkins* (1976), 170 Ind.App. 171, 181, 352 N.E.2d 502, 509, *reh. denied, trans. denied.* Mental deficiencies of parents alone do not justify termination without evidence of harm or possible future harm to a child. However, such limitations may be considered as a factor if there are other reasons which would support the termination decision. *Tucker, supra,* at 779. A termination of the constitutionally-protected right of the parent to make a home and raise the child is proper only if each element of I.C. 31–6–5–4(c) is established by clear and convincing evidence. *Waltz v. Daviess County DPW* (1991), Ind.App., 579 N.E.2d 138, 140.

█ Here, the DPW presented evidence that, absent intensive supervision, R.R. presented a danger to himself and others. The parents' abilities, and their intellectual and emotional limitations, as they related to their capacity to care for R.R., were appropriately considered as factors in the termination decision. *M.J.G., supra,* at 1389. Moreover, each element of I.C. 31–6–5–4(c) was established by clear and convincing evidence. The trial court's order terminating the parental rights of Rouse and Shaw was not entered in violation of their constitutional rights.

Affirmed.

HOFFMAN and BARTEAU, JJ., concur.