630 N.E.2d 1368 (1994)
In re the Termination of the Parent-Child Relationship between the CHILDREN: T.C., C.F., AND the PARENTS: P.C., B.T.D., and B.R.F.
P.C., Appellant-Respondent,
v.
The Department of Public Welfare of Allen County, Appellee-Petitioner.
No. 02A03-9307-JV-232.
Court of Appeals of Indiana, Third District.
March 21, 1994.
Rehearing Denied June 6, 1994.
Transfer Denied September 30, 1994.
*1369 Richard L. Williams, Fort Wayne, for appellant.
David C. Van Gilder, Lebamoff Law Offices, Fort Wayne, for appellee.
HOFFMAN, Judge.
Appellant-respondent[1] P.C. appeals the trial court's judgment terminating her parental rights in her two minor children, T.C. and C.F.[2]
The evidence relevant to the appeal discloses that on November 28, 1989, the Allen County Department of Public Welfare filed a petition alleging five-year-old T.C. to be a child in need of services (CHINS) after P.C. struck him with a belt causing welts on his buttocks and face. P.C. admitted the allegations in the CHINS petition regarding the incident, T.C.'s sporadic attendance at kindergarten, and her lack of financial means to support T.C. After a dispositional hearing in February 1990, a Parent Participation Plan (PPP) was adopted. The PPP ordered inter alia that:
"5. Said [P.C.] shall accept, attend and successfully complete the following program or services:
A. Obtain a psychiatric evaluation and follow recommendations of therapist which may include in-patient or Day Therapy and chemotherapy for depression.
B. Attend and complete a full set of Parenting Classes[,] and child development classes if necessary.
C. Become involved with Indiana Rehabilitation Services upon referral by Department of Public Welfare.
6. Said [P.C.], to ensure a safe home environment and to maintain [her] bond with said child, shall:
A. Maintain stable housing suitable for [T.C.].
B. Provide the Department of Public Welfare with advisable means of support which may include but not be limited to employment.
C. Maintain visitation with [T.C.] as outlined by the Department of Public Welfare.
7. Said child be[:]
A. continued in pre-school program
B. counseling[.]"
*1370 A total of three caseworkers were assigned in this matter between December 1989 and the date of the termination hearing in February 1993. P.C. underwent psychological and psychiatric examinations in December 1989, March 1990 and December 1991. The psychological examination in December 1989 reported that P.C. had skills which would help in her rehabilitation and with finding employment but that she had significant personality problems. Most notably depression, feelings of inferiority, "poor controls" and ambivalence were reported. Those problems coupled with her need for parenting training "indicate that she has high potential for child abuse and/or neglect." The psychologist recommended that the problems be addressed by psychiatric care and chemotherapy for depression. The psychologist noted that P.C. seemed to have inappropriate expectations of T.C. and that she treated him more as a "little adult" rather than a "little child."
P.C. was then evaluated by a psychiatrist in March 1990. The psychiatrist' evaluation revealed that P.C. did not require medication and she was not depressed. At the termination hearing, the psychiatrist testified that he believed P.C. was not usually depressed and that P.C. believed that she was the person who had the most to offer her son. She reported to the psychiatrist that her major sources of stress were financial concerns and finding a good job. She did not find her son a major source of stress. She explained that the incident with the belt occurred when she became exasperated and at the same time felt pressure from her financial situation.
At the termination hearing, the initial caseworker testified that P.C. generally complied with the terms of the PPP. The caseworker noted that P.C. largely maintained her scheduled visitation with T.C. unless she notified the caseworker of transportation problems. The caseworker recalled two occasions P.C. missed visitation for reasons other than transportation. Once P.C. telephoned because "she had something to do at the courthouse." On the other occasion, P.C. forgot.
When the caseworker was questioned about P.C.'s compliance with the PPP, the following colloquy transpired:
"Q If I could have Exhibit # 4 [the PPP], please. Could you begin on Page One, Subparagraph 4(A). I believe you testified to this again, but we're going to go through each separate subparagraph. Did she not in fact keep in contact with you at all times?
A Yes, I stated that.
Q Okay, and did she accept visits at her home, announced and unannounced?
A I frankly did not make many home visits to her home. I had been to [P.C.'s] home but she's always been appropriate with me.
Q And she signed all the appropriate releases and consents and so forth to have services done for both TEC and herself?
A Right.
Q And did you ever request any information that would fall under Subparagraph 4?
A Regarding paternity?
Q Or anything that would fall under Subparagraph 4. Did you ever ask for any information and not receive it from her?
A No.
Q Was child support ever ordered by the Court?
A For [P.C.]?
Q Yes?
A No.
Q Was she ever required to pay medical expenses for her son or show proof of financial insurance coverage?
A No.
Q Okay, Subparagraph 5. You had testified that she in fact did get a psychological evaluation and completed that 
A No, she received the psychiatric and she did get the psychological at Phoenix and that was done.
Q So she did comply with 5(A)?
A Right.
* * * * * *
Q I will restate the question. Did she in fact receive a psychiatric evaluation?
A Yes.
Q Was she ever ordered to have any chemotherapy done for depression?

*1371 A To the best of my recollection, the psychiatrist felt that medication was not deemed appropriate at that time. That's to the best of my knowledge according to the reports I got.
* * * * * *
Q And  let me correct myself here. Under 5(B) she did attend parenting classes, correct  you testified to that, correct?
A I don't know if that's what I said.
Q Well, I'm not trying to change your answer  the question is did she complete parenting classes?
A I believe I said that she was going to parenting classes. I don't remember her completion because there were some that she missed.
Q That's fine. So to your knowledge you do or do not know if she completed it?
A To my knowledge right now I don't remember if she completed them.
Q Okay and as to 5(C) a referral was never made during your tenure as ongoing caseworker?
A Right.
Q During your period as ongoing caseworker, that house that she was in  that residence was a suitable place to raise a child?
A I believe it was  I mean that was the place where TEC was. The apartment complex was a nice apartment complex.
* * * * * *
Q To your knowledge, how often did she miss a weekly visit?
A Ohh  I can't give a number. There were several times that she called that I have record of that I made. 12-20 she canceled for her visit. 1-27 she canceled the visit, she had no ride, things like that I mean 
Q Now you've testified that you did not participate in the visitation and then you later testified that you saw no improvement in her parenting skills. On what basis can you make that evaluation when you did not see interaction between the child and the mother?
A I made that statement basically on the continued comments that [P.C.] would make about  that she saw nothing wrong in the way she disciplined the child, that during some of our conversations she felt that the reason why she was involved with us was because other people were jealous of the way she raised TEC. There was no change in anything that she said from the beginning to the end about that she felt that any changes needed to be made or were going to be made and this is how I felt to me that there was really no change in my involvement regarding [P.C.]."
In June 1991, P.C. gave birth to C.F.T.C.'s second caseworker became the ongoing caseworker for C.F. as well. Based upon his past involvement with P.C. regarding T.C., the caseworker believed P.C. would be unable to care for C.F. A few days after her birth, C.F. was determined to be a CHINS and was placed in foster care.
In a psychological examination of P.C. performed in December 1991, after the birth of C.F., two tests measuring parenting skills were conducted. The report stated inter alia:
"[P.C.'s] scores appear to indicate a good ability to be nurturing and supportive. Since [P.C.] is not married at this time, the skill measuring parents' cohesiveness does not apply. The rest of [P.C.'s] scores fall in the satisfactory range. This, however, indicates that improvement is needed in these areas.
The second test measuring parenting skills was the CAP Inventory which measures that potential for child abuse. [P.C.'s] score falls in the normal range. This test also measures the stress level of the individual, how rigid one's ideas about the parents and behavior of children are, how happy the person feels, perceptions of problems with child, family, and self, and difficulties in social relationships. [P.C.'s] responses indicate that she feels generally unhappy with life. This unhappiness may be related to difficulty in relationships. All other scores were within the normal range. It is important to note, however, that at the time [P.C.] took these tests her *1372 children were in foster placement, thus she was not under the stress of daily caretaking at this time. The consistent stress of caretaking may lower these scores."
Based upon the other tests, the psychologist concluded that while P.C. is sociable and adequate parenting skills were indicated, her anger, hostility and suspiciousness of others when considered with other shortcomings would impair her ability to "parent effectively."
In November 1991, an amended PPP relating to both T.C. and C.F. was adopted. P.C. was required inter alia to attend counseling sessions with the psychologist who interpreted the test results and to accept home visits from SCAN [Stop Child Abuse and Neglect].
P.C. was seen by the psychologist on four occasions, ending in December 1992. According to the psychologist, P.C. seemed ambivalent. She stated at one point that she wanted to be a mother to her children. At another time she questioned whether she had the ability. In discussing an evaluation by the leader of the Parent Child Nurturing Clinic at Park Center, the psychologist noted that P.C. participated in a full set of sessions at the clinic. Further, the leader concluded P.C. "was cooperative and conscientious. She came, she participated, however she was limited in insight." The final determination was that P.C. did not benefit from the sessions.
At the termination hearing, the DPW presented testimony by five social work professionals to whom P.C. had been referred or whom P.C. had contacted for assistance. Two of the five had limited contact with P.C. The SCAN counselor found that after five visits, P.C. did not obtain a reasonable degree of understanding regarding alternatives to corporal punishment. The therapist who led a group for mothers who were working toward reunion with their children noted that P.C.'s participation in the group "was very good. It was often and I think it was sincere." A nurse who conducted parenting groups stated: "[P.C.] and TEC have a close bond but [P.C.] does lack skills that she would need to be the kind of mother that [P.C.] would like to be if she could." The nurse also noted that in the two years she had known P.C., P.C.'s parenting skills had improved a little. She noted that initially P.C. had no insight into why T.C. was removed, but "as we ... went through I think she was only beginning to realize that she could have changed some of her behavior that then would have affected his removal, that perhaps he would not have been." P.C.'s greatest deficits in the view of the nurse were "role reversal" and elevated expectations of T.C. which she termed "subtle neglect."
The same psychologist who interpreted P.C.'s psychological tests conducted in December 1991, supervised a series of psychological tests performed on T.C. His I.Q. was 100 to 102. She found that he had some vocabulary deficit at the time. His verbal scores indicated an age of four years and eleven months, when he was five years and eight months. The psychologist concluded that T.C. was not stimulated adequately. No ongoing therapy was recommended. Instead enrichment programs, encouragement in activities at which he excelled and continued supervised visits with his mother were recommended.
At the time of the termination hearing, the psychologist testified that it would be difficult for P.C. to consistently provide opportunities for enrichment programs, e.g. trips to the zoo. Also, she stated that the birth of C.F. would add a complicating factor to P.C.'s parenting abilities.
A psychologist who conducted 17 sessions with T.C. reported that T.C. "very consistently said he loved his mother and he wanted to see her." The psychologist recommended that T.C.'s visitation with P.C. be terminated in February 1992, after an incident during visitation which was "traumatic and upsetting" for T.C. During the visitation, P.C. told T.C. of the possibility of the termination of her parental rights. P.C. and T.C. became upset and began crying. During the incident, P.C. stated that she was going to take T.C. and that he needed to be with her. The two had to be physically separated. Police had to restrain P.C. while T.C. was escorted from the building. The psychologist termed P.C.'s behavior inappropriate.
*1373 During the termination hearing, the caseworker testified that he did not believe P.C. had fully complied with the terms of the amended PPP. She had not consistently maintained a stable home environment after T.C. was removed from her home. As to visitation, the caseworker noted that P.C.'s visitation with C.F. was on an informal basis with C.F.'s foster mother. They would meet at their homes, the zoo or shopping. However, visitation with T.C. was terminated in February 1992 upon a recommendation by the psychologist treating T.C. Another requirement, that she obtain employment, was removed at a dispositional hearing in order to alter P.C.'s focus from employment and housing and direct her focus to emotional and psychological concerns. The caseworker noted that he made a referral to rehabilitation services but that P.C. did not follow through on the referral. However, P.C. sought and was awarded Social Security disability benefits.
At the time of the hearing, the caseworker as of December 1992 for T.C. and C.F. had made no referrals regarding the PPP. She knew that P.C. was still visiting C.F. through C.F.'s foster mother on an informal basis.
At the hearing, P.C. testified that at the time T.C. was removed from her home, she did rely on means of discipline other than corporal punishment. As a first measure, commonly, she would take away privileges. Although at the time of the incident which caused T.C.'s removal P.C. believed corporal punishment was acceptable, she did not believe she appropriately limited her actions.
While she stated that she did not believe that she benefited from all of the counseling she received, she did learn steps to take before "exploding" if one becomes frustrated with children. She noted that prior to T.C.'s removal she had focused on matters such as employment and money rather than T.C. She reported that she was prepared to focus on her children, to work with the system, and to be responsible.
The dispositive inquiry on review is whether the evidence is sufficient to sustain the trial court's decision terminating P.C.'s parental rights.
To involuntarily terminate parental rights, the DPW must present clear and convincing evidence to establish each element of IND. CODE § 31-6-5-4(c). Shaw v. Shelby Cty. D. of Public Welfare (1992), Ind. App., 584 N.E.2d 595, 597-598. The statute provides:
"(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(2) there is a reasonable probability that:
(A) the conditions that resulted in the child's removal will not be remedied; or
(B) the continuation of the parent-child relationship poses a threat to the wellbeing of the child;
(3) termination is in the best interests of the child; and
(4) there is a satisfactory plan for the care and treatment of the child."
IND. CODE § 31-6-5-4(c) (1992 Supp.).
When reviewing a termination of the parent-child relationship, the evidence may not be reweighed and the credibility of the witnesses may not be judged. A court on review will consider only the evidence and reasonable inferences therefrom which are most favorable to the judgment. Shaw, 584 N.E.2d at 598. Children are not to be removed from the home of the natural parent because there is a "better" place for them. Id. at 600. Only when the situation while in the custody of their parents is wholly inadequate for their very survival, should the children be removed. "However, this is a graduated yardstick against which the particular circumstances in a case must be measured." Id. When evaluating the circumstances, the court must subordinate the interests of the parents to those of the children. Id. The time-honored right of parents to establish a home and raise their children, as protected by the Fourteenth Amendment to the United States Constitution, is subordinated to the children's interest in determining an appropriate disposition of a petition to terminate parental rights.

Id. at 601, citing Pierce v. Society of Sisters (1925), 268 U.S. 510, 534-535, 45 S.Ct. 571, 573-74, 69 L.Ed. 1070; *1374 Meyer v. State of Nebraska (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 626-27, 67 L.Ed. 1042.
In separate, but identical, orders dated April 1, 1993, the trial court determined that P.C.'s parental rights should be terminated. The specific findings relied upon by the trial court were: 1) a statement made by P.C. to the DPW caseworker who investigated the November 1989 report of abuse, prior to C.F.'s birth, to the effect that "the child needs to feel pain to learn"; and 2) "the mother has no insight as to why the child was removed from her custody."
However, P.C.'s statement was made at the time T.C. was initially removed in late 1989, approximately three and one-half years prior to the termination order. Further, the record indicates that P.C.'s "lack of insight" constituted an appraisal made early in the proceedings. A DPW witness observed that P.C. "initially" had no insight but that P.C. had made improvement in that area. A termination of parental rights cannot be based entirely upon conditions which existed in the past, but which no longer exist. Roark v. Roark (1990), Ind. App., 551 N.E.2d 865, 871.
In addition to remoteness, another shortcoming of the factors are their inapplicability to C.F. It is true that a welfare department need not wait until the occurrence of a tragedy to intervene, id. at 872; however, basing C.F.'s removal on a single incident which occurred with a sibling two years previously does not warrant termination of the parent-child relationship. The only concrete evidence regarding C.F. contained within the record indicates that P.C. maintained informal visitation with C.F. through her foster mother from C.F.'s birth to the time of termination. The vague reference to the possibility of inappropriate conduct with C.F. is not clear and convincing evidence of the factors contained in IND. CODE § 31-6-5-4(c).
The overwhelming evidence indicates that P.C. was not a perfect person or a perfect mother. Neither are required of a parent prior to termination of the parent-child relationship. IND. CODE § 31-6-5-4. The uncontradicted evidence indicates that P.C. had some emotional deficits but that she scored in the average range on psychological tests aimed at assessing parenting skills. See Matter of Tucker (1991), Ind. App., 578 N.E.2d 774, 779-780 (termination statute does not allow termination solely on basis of mental illness, merely one factor to be considered in determination). Despite evidence that P.C. did not flawlessly comply with the amended PPP, the evidence of P.C.'s participation and compliance with DPW conditions which she sustained over the course of approximately three and one-half years demonstrates adequate effort to stave off a judgment of termination of parental rights.
The evidence amply supports a finding that P.C. engaged in a single incident of unreasonably harsh corporal punishment which left welts on T.C. However, the DPW's overt goal to require P.C. to renounce corporal punishment in favor of other methods of discipline is not required of a parent. Even discounting P.C.'s testimony that she engaged in other methods of discipline and that corporal punishment was not common, only unreasonable corporal punishment is proscribed by statute. Within the statute regarding CHINS determinations appears the following provision:
"Nothing in this chapter limits the right of a person to use reasonable corporal punishment when disciplining a child if the person is the parent, guardian, or custodian of the child... ."
IND. CODE § 31-6-4-3(e) (1992 Supp.).
Recognizing that the one incident was unreasonable, the record does not support a termination order on that basis.
Further, the record is devoid of evidence that termination would be in the best interests of T.C. or C.F. From the evidence adduced that at age five T.C. was slightly delayed in verbal skills which could be enhanced by enrichment activities, it does not follow that T.C.'s best interests would be served by termination of his relationship with P.C. Evidence that P.C. may not ever be able to provide enrichment opportunities such as trips to the zoo, does not lend support to a termination finding. While enrichment pursuits are laudable, the DPW is not *1375 charged with a duty to impose extraordinary cultural and intellectual requirements upon parents.
The evidence demonstrates that P.C. made substantial efforts to comply with the participation plans. Further, it would be useless and wasteful to provide a process by which a parent could work toward reunion with a child if, after three years, the basis for termination is the events surrounding the child's initial removal. The evidence here may support a value judgment that a "better" place could exist for T.C. and C.F.; however, such is not the province of welfare departments and courts. The evidence does not support a finding that the children's survival was threatened or that termination was in their best interests.
Accordingly, the judgment of termination of parental rights is reversed.
Reversed.
GARRARD, J., concurs.
STATON, J., dissents with Opinion.
STATON, Judge, dissenting.
I dissent. The issue presented for review has been waived. Too, the evidence clearly shows that the pattern of abusive and neglectful behavior is unlikely to be remedied.
P.C. presents for review a single issue: "Whether I.C. 31-6-5-4 violates substantive due process of law under the Fourteenth Amendment to the United States Constitution." The constitutional argument was not first addressed to the trial court; therefore, P.C. has waived the argument for appellate review. An appellant may not challenge the constitutionality of a statute for the first time on appeal. Salrin v. State (1981), Ind. App., 419 N.E.2d 1351, 1354; Meyer v. Anderson Banking Co. (1961), Ind., 177 N.E.2d 662, 665, reh. denied. The majority sua sponte frames and addresses an issue of insufficiency of the evidence to support the parental rights termination.
The majority then proceeds to reweigh the evidence. However, in reviewing a judgment terminating parental rights, this court is constrained to consider only the evidence and reasonable inferences which are most favorable to the judgment. Egly v. Blackford County DPW (1992), Ind., 592 N.E.2d 1232, 1235.
The evidence most favorable to the judgment discloses that P.C. struck T.C. repeatedly with a belt, causing welts on T.C.'s face and buttocks. P.C. indicated an ongoing potential for abusive behavior toward T.C. when she explained to a DPW caseworker that "at times T.C. reminded her of his father, who she hated, so at times she would hit T.C. and at times she would love T.C." Record, pp. 84-85. T.C.'s psychologist indicated that T.C.'s self-esteem was diminished because P.C. had difficulty accepting T.C.'s appearance and bi-racial heritage.
Moreover, P.C.'s pattern of behavior showed a lack of motivation to accomplish the goals necessary for reunification. P.C. maintained involvement in abusive personal relationships, was evicted from a shelter where she sought temporary housing and erratically attended counseling and parenting skills sessions. The service coordinator at Park Center testified that P.C.'s case was closed for lack of contact. A social worker with the "Stop Child Abuse Now" organization testified that visits to P.C.'s home were terminated because P.C. failed to appear for scheduled appointments.
Dr. Ina Carlson conducted an evaluation of P.C. and concluded that P.C. lacked appropriate skills to effectively parent T.C. She opined that the addition of a second child to P.C.'s family would result in additional stress and make it more difficult for P.C. to attain her parenting goals. The record discloses that, subsequent to Dr. Carlson's evaluation, P.C. gave birth to a third child.
After offering services to P.C. over a period of several years, the social workers who attempted to assist P.C. in developing her parenting skills unanimously opined that P.C. failed to make any significant progress. Clearly, the DPW established that P.C.'s pattern of abusive and neglectful behavior was unlikely to be remedied. Therefore, I dissent.
NOTES
[1] Attorney for appellant is directed to the Rules of Appellate Procedure, Ind. Appellate Rule 8.2. App.R. 8.2(A)(2) requires briefs to be "bound in either book or pamphlet form along the left margin." The reference in App.R. 8.2(A)(3) to the "front cover" indicates that a back cover is also required. App.R. 8.2(B)(5) provides: "Reproductions or summarizations of parts of the record in a brief shall be immediately followed by a citation to the pages of the record at which those parts appear." Although rebriefing or other sanction could be imposed, the merits will be addressed in this case.
[2] The trial court's judgment also involuntarily terminated the parental rights of the fathers: B.T.D. and B.R.F. The fathers are not participating in this appeal.