In the Matter of the Termination of the Parent–Child Relationship of M.B., C.B. and D.B. Children, and C.B. and J.W., Parents. C.B. and J.W., Parents, Appellants–Respondents,

v.

MARSHALL COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee–Petitioner.

No. 50A03–9308–JV–258.

Court of Appeals of Indiana, Third District.

Aug. 8, 1994.

Transfer Denied Dec. 30, 1994.

Marc A. Morrison, Morrison & Morrison, Plymouth, for appellant C.B.

Kenneth H. Lukenbill, Stevens, Travis, Fortin, Lukenbill & Burbrink, Plymouth, for appellant J.W.

Douglas N. Hite, Joseph V. Simanski, Plymouth, for appellee.

HOFFMAN, Judge.

Appellants-defendants C.B. and J.W. (hereinafter Father and Mother) appeal from the trial court's judgment terminating parental rights in their three children M.B., C.B., and D.B. The facts pertinent to this appeal are summarized below.

Mother is the parent of four children J.W., M.B., C.B., and D.B. Father is the parent of M.B., C.B., and D.B. On July 6, 1988, the Marshall County Department of Public Welfare (DPW) received a report of neglect caused by dirty housekeeping. Witnesses observed the children eating off a dirty kitchen floor, dishes overflowing in the kitchen sink with mold growing on them, dirty diapers, and a dirty bathroom. A second involvement occurred on March 28, 1989, when the youngest child, D.B., was found to be undernourished and underdeveloped. DPW was called again when Father was arrested for molesting Mother's natural daughter, J.W. The charge alleged that Father had forced J.W., who was five at the time, to perform oral sex. A Child In Need of Services (CHINS) petition was filed in regard to J.W., who then voluntarily left the home to live with her natural father.

The three other children were removed from the home when Mother and Father were arrested for child molestation on January 8, 1990. Father was charged with child molesting and attempted child molesting. In the first charge, it was alleged that Father performed oral sex on A.W., who was 12 at the time and was not related to either Father or Mother. In the second charge, it was alleged that Father attempted to perform oral sex on D.S., who was a child of 15 and was not related to either Father or Mother. Father was convicted by a jury on both charges. The trial court sentenced him to twenty years' imprisonment and imposed a $10,000.00 fine. Father has remained imprisoned since January 6, 1990. His last contact with the children was shortly before trial in July of 1990.

Mother was charged with four counts of child molesting and one count of attempted

child molesting, involving A.W. and D.S. On March 2, 1990, Mother was also charged with one count of welfare fraud. On March 15, 1991, Mother pleaded guilty to one count of welfare fraud and one count of child molesting. She was sentenced to three years' imprisonment for welfare fraud and eight years, with two suspended, for child molesting. Mother was released on bond and was granted and exercised regular visitation with the children until January 1991.

A CHINS petition was filed with regard to the children on January 9, 1990. A fact-finding hearing was conducted on June 6, 1991, and the children were found to be CHINS. A dispositional hearing was held on July 3, 1991, and the Marshall Circuit Court issued its Dispositional Order on August 19, 1991. In that order, the court made the children wards of the court and placed them in foster homes. DPW filed a petition for Termination of Parental Rights on February 20, 1992.

On November 24, 1992, DPW filed a "Petition For Hearing To Introduce Statements Pursuant to Indiana Code § 31–6–15–1 *Et. Seq.*" A hearing was held on January 7, 1993. The trial court overruled Mother and Father's oral objections and granted the petition in its "Pre-trial Conference Order" dated January 20, 1993. On April 13, 1993, the Marshall Circuit Court entered a judgment terminating the parental rights of Mother and Father.

Mother and Father raise five issues on appeal:

(1) whether the trial court erred in failing to require DPW to prove by clear and convincing evidence each element set forth in IND.CODE § 31–6–5–4(c);

(2) whether the trial court erred in admitting the out-of-court statements of the minor children;

(3) whether the trial court gave undue consideration to the *pro se* dissolution of marriage between Mother and Father;

(4) whether the trial court erred in failing to return the parent/child relationship to the "status quo;" and

(5) whether the appellants were denied their constitutional right to confront witnesses.

To involuntarily terminate parental rights, the DPW must prove by clear and convincing evidence each element of IND.CODE § 31–6–5–4(c). *Shaw v. Shelby Cty. D. of Public Welfare* (1992), Ind.App., 584 N.E.2d 595, 597–598. The statute provides:

"(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:

(A) the conditions that resulted in the child's removal will not be remedied; or

(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child."

IND.CODE § 31–6–5–4(c) (1992 Supp.).

When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. It will consider only the evidence and reasonable inferences therefrom which are most favorable to the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Shaw*, 584 N.E.2d at 598. Furthermore, since neither party requested the trial court to enter specific findings of fact pursuant to Ind. Trial Rule 52, the general finding or judgment will control as to issues upon which the trial court has not expressly found, and special findings will control only as to those issues which they cover. *Quebe v. Davis* (1992), Ind.App., 586 N.E.2d 914, 917.

Children are not to be removed from the home of the natural parent because there is a "better" place for them. Only when the situation while in the custody of their parent is wholly inadequate for their very survival, should the children be removed. However, this is a graduated yardstick against which the particular circumstance in a case must be measured. *Shaw*, 584 N.E.2d at 600. When evaluating the circumstances, the court must subordinate the interests of the parents to

those of the children. *Id.* The trial court need not wait until the children are irreversibly influenced by a deficient lifestyle such that their physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *J.K.C. v. Fountain County Dept. of Pub. Wel.* (1984), Ind.App., 470 N.E.2d 88, 92.

Mother and Father first argue that DPW is required to prove by clear and convincing evidence both (A) and (B) of IND. CODE § 31–6–5–4(c)(2). The statute, however, does not require proof of both. *See B.R.F. v. Allen County D.P.W.* (1991), Ind. App., 570 N.E.2d 1350 (DPW need not prove both and the trial court only need enter findings based on the evidence of one of either subsection (c)(2)(A) and (B)). DPW stated at trial and in its brief that it will proceed under IND.CODE § 31–6–5–4(c)(2)(B), proving "the continuation of the parent-child relationship poses a threat to the well-being of the child."

The trial court made specific findings of fact concerning the continuation of the parent-child relationship. The trial court found that when M.B., C.B., and D.B. were first removed from the parents' home and placed in foster care, they exhibited strange behavior. Evidence revealed that D.B.'s diaper could not be changed without two adults holding him down. His foster mother testified, "You could not take a diaper off of this child without him screaming and kicking and [saying] 'No.' He would put his hands and cover his privates and scream and it was really difficult." On one occasion when the children were left with a baby sitter by one of the foster mothers, the children engaged in inappropriate sexual behavior with an anatomically correct doll. Specifically, M.B. encouraged C.B. to lick and touch the anatomically correct male doll. C.B. also performed oral sex on a foster mother's child. When C.B. was asked why she had done this, she replied that she loves the child. Additionally, C.B. stated that Mother had told her the act was love. Another foster parent testified that when she tried to comfort M.B., who was having nightmares, the child jumped across the foster mother's lap and started "humping" her and then urinated on her leg.

M.B. then told the foster mother that she loved her. When the foster mother asked why M.B. had done this, she replied that she missed her Daddy, and she said that "this is how you love people." Based on this evidence, the trial court found that DPW had proved by clear and convincing evidence that continuation of the parent-child relationship posed a threat to the well-being of the children.

Mother and Father rely on *Page v. Greene County Dept. of Welfare* (1991), Ind.App., 564 N.E.2d 956, to support their position that "a trial court should judge a parent's fitness to care for a child as of the time of the termination hearing and take into consideration any evidence of changed conditions ..." *Id.* at 960. Therefore, Mother contends, DPW failed to prove by clear and convincing evidence Mother's unfitness because she has received her GED, participated in family learning classes and received counseling and assertiveness training. Mother believes that at the time of the termination hearing, there were changed conditions which did not merit termination of her parental rights.

However, the Court in *Page* went on to state: "The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children." *Id.* Here, the home life Mother and Father provided for their children included engaging the children in sexual acts, not allowing the children to use the bathroom, locking the children in their bedroom for several hours at a time, allowing the children to smear their feces on themselves and the walls, and forcing the children to eat off a dirty kitchen floor. Furthermore, Danica Shipp, a counselor at the Women's Prison, testified in a written report that "[i]t is this writer's opinion that without the continuance of her vocational or college training, and support groups, [Mother] will most likely return to a male-supported and dominated living arrangement. [Mother] believes that her husband was the cause of her criminal activity and takes little responsibility for her own participation in the offense." Another counselor testified "[Mother] stated that she knows she needs to work on her mental

health issues but is scared to 'dig up the past.' She saw our staff psychologist, Dr. Berry, on one occasion, but has not made any additional efforts to work with Dr. Berry on her mental health issues." Based on the totality of the evidence, there is an habitual pattern of neglect and no indication of changed mentality on behalf of Mother. The trial court's finding was not clearly erroneous and consequently, will not be overturned by this Court.

■ Mother and Father next argue the termination was not in the best interests of the children. Mother relies on caseworker reports which indicate that she had positive contact with the children during visitations. One caseworker stated "[t]hey always appeared very glad to see her." Father contends that his parents are willing and able to take care of the children, and he should not have his parental rights terminated.

The trial court's findings indicate that the children have progressively improved with counseling. While the children have been moved to several different foster homes, mainly because of the behavior exhibited by the children when they were first removed from the parents' home, caseworkers feel these children are not "hard to place" and will be easily adopted. The situation provided by Mother and Father proved to be wholly inadequate for the children's survival; this is evidenced by D.B.'s malnutrition and the anti-social behavior they exhibited. The trial court found it in the best interests of the children to terminate parental rights so that the children could be adopted and provided with an adequate home. Given this finding, if custody was granted to Father's parents there would be potential contact between Father and children. The trial court specifically found that continuing such a relationship would not be in the children's best interests.

Mother and Father argue that DPW does not have a satisfactory plan for the care and treatment of the children. Mother points out that the children have been moved to several foster homes during a ten-month period, DPW failed in its obligation to seek reunification of the family, and DPW failed to provide joint counseling sessions with her.

"DPW is not required to detail completely a child's future, but need only point out in a general sense the general direction of its plan." *Page*, 564 N.E.2d at 961 (plan to keep children in foster care until adoption showed clear and convincing evidence that DPW had a satisfactory plan for the care and treatment of children).

Based on this standard, DPW is not required to make a showing of attempted reunification or provide joint counseling sessions. The fact that a DPW caseworker and a counselor stated the children are adoptable and the children would remain in foster care until their adoption, is clear and convincing evidence that DPW has a satisfactory plan for the care and treatment of the children.

■ Next, Mother and Father contend the trial court erred in admitting the out-of-court statements of M.B. and C.B. to DPW counselor, Jillorna Uceny, and to foster parent, Jackie Brown. DPW sought admission of the statements under IND.CODE §§ 31-6-15-3 and 4 (1990 Supp.):

"**Requirements for admissibility of statements or videotapes**

Sec. 3. A statement or videotape described in section 2 of this chapter is admissible in evidence in an action to determine whether a child is a child in need of service or in an action to determine whether the parent-child relationship should be terminated if, after notice to the parties of a hearing and of their right to be present:

(1) the court finds, in a hearing attended by the child, that the time, content, and circumstances of the statement or videotape and any other evidence provide sufficient indication of reliability; and

(2) the child:

(A) testifies at the proceeding to determine whether:

(i) the child is a child in need of services; or

(ii) the parent-child relationship should be terminated;

(B) was available for face-to-face cross-examination when the statement or videotape was made; or

(C) is found by the court to be unavailable as a witness because:

(i) a psychiatrist, physician, or psychologist has certified that the child's participation in the proceeding creates a substantial likelihood of emotional or mental harm to the child;

(ii) a physician has certified that the child cannot participate in the proceeding for medical reasons; or

(iii) the court has determined that the child is incapable of understanding the nature and obligation of an oath.

**Child unavailable to testify**

Sec. 4. If a child is unavailable to testify at the proceeding for a reason listed in section 3 of this chapter, a statement or videotape may be admitted in evidence under this section if:

(1) the child is a child in need of services; or

(2) the parent-child relationship should be terminated."

IND.CODE §§ 31–6–15–3 and 4 (1990 Supp.).

Mother and Father assert that DPW's failure to have the children present at the termination proceeding should have resulted in the statements being excluded.[1] The purpose of the statute is to protect children from mental and/or emotional harm associated with testifying. This intent could arguably include excluding children from the courtroom. Here, counsel for DPW stated to the trial court that the children "were available" but counsel did not want the children listening to the testimony. The trial judge accepted "availability" of the children as opposed to their actual presence, and no objection was made by defense counsel. Furthermore, Dr. Berardi, a child psychologist, submitted an affidavit which indicated the children would be traumatized if forced to recount their abuse. This trauma would be no less if the children had to hear, in graphic detail, the same events as recounted by counselors and foster parents. Thus, by excluding the chil-

dren from the proceeding, the trial court met the spirit of the statute by protecting the children from further trauma associated with testifying or being in the courtroom during testimony.[2] *See Matter of Adoption of D.V.H.* (1992), Ind.App., 604 N.E.2d 634, 638–39, *trans. denied* (no abuse of discretion by trial judge in admitting guardian ad litem's testimony concerning verbatim statements made by child; Statute [IND.CODE § 31–6–5–4] contemplates some summarization of child's desires and state of mind).

Mother and Father's reliance on *Roark v. Roark* (1990), Ind.App., 551 N.E.2d 865, is misplaced. The Court in *Roark,* never reached the question of whether a child is "required" to be in attendance. The Court's analysis concerns children who have been deemed able to testify but because of the trauma associated with testifying in a courtroom, will have their testimony videotaped or transmitted via closed circuit television. *Id.* at 869. The case at bar is inapposite. M.B. and C.B. were examined by a psychologist who determined that participation in the proceeding could have caused them mental or emotional harm. The trial court correctly accepted this finding as satisfying the requirement set forth in IND.CODE § 31–6–15–3(2)(c)(i) and allowed the children's statements into evidence.

Mother and Father also argue the statements lack a sufficient indication of reliability. This Court, however, declines their request to reweigh the evidence. *See Shaw,* 584 N.E.2d at 598.

■ Mother and Father further assert the affidavit provided by Dr. Berardi is insufficient to satisfy the statutory requirement of "certification" and should not be admitted because the affidavit was based on hearsay. This Court has recognized that statutes are examined as a whole "giving plain and ordinary meaning to the words used." *Berkey v. Kosciusko County* (1993), Ind.App., 607 N.E.2d 730, 731–32, *trans. denied.* The plain meaning of "certification" as found in *Black's*

---

1. Neither Mother nor Father dispute the applicability of IND.CODE §§ 31–6–15–1 and 2 which are prerequisites to the application of IND.CODE §§ 31–6–15–3 and 4.

2. The legislature has recently amended IND. CODE § 31–6–15–3 to exclude the language "in a hearing attended by the child."

*Law Dictionary* is "[t]o authenticate or vouch for a thing in writing. To attest as being true or as represented." *Black's Law Dictionary* 207 (5th Ed.1979). Dr. Berardi's affidavit does nothing more than attest that the children would regress rather than open up if questioned at trial. This Court will not give more meaning to the word "certify" than its plain definition. Furthermore, neither Mother nor Father suggest an alternate meaning of the word which would satisfy the statute, but simply assert that Dr. Berardi's affidavit does not meet statutory requirements.

The trial court's decision in admitting the opinion evidence will only be reversed for an abuse of discretion. Further, an expert may utilize hearsay information in forming his opinion. *Cox v. American Aggregates Corp.* (1991), Ind.App., 580 N.E.2d 679, 686, *trans. denied.*

Dr. Berardi examined the children for an hour and examined Ms. Uceny's notes before determining that the children would be harmed if forced to testify. In his affidavit, he stated:

"The danger in direct questioning is that the children will withdraw further because of their unwillingness and lack of readiness to be able to discuss [an] experience that has been so threatening to them. As a consequence, forced examination and inquiry would not only set back the treatment process, but recreate a threatening and anxiety provoking experience that replicates their previous victimization thereby compounding the harm done to them."

The trial court, in its discretion, correctly allowed this "certification" based on actual examination of the children and, in part, on hearsay. There being a showing of substantial likelihood of mental or emotional harm, the trial court properly admitted the affidavit into evidence.

Mother contends the admission of the children's testimony served as "linchpins" to the decision to terminate her parental rights. However, there was other evidence on which the trial judge could rely to determine the children would suffer harm if forced to answer questions on direct examination. The testimony of Ms. Uceny and Mrs. Brown contained their own observations of the children's unwillingness to discuss the abuse they have suffered. Based on the totality of the evidence before the trial court, the trial judge concluded there was a "substantial likelihood" the children would suffer emotional or mental harm if forced to testify.

A finding of unavailability means the statements may be admitted into evidence under IND.CODE § 31–6–15–4. Consequently, there was no error in admitting the statements into evidence.

■ Next, Mother and Father assert that the trial judge gave undue consideration to the *pro se* dissolution of marriage action. Mother and Father correctly argue that the trial judge's consideration of the *pro se* dissolution of marriage as "deceptive" and "reflective of the character of each party" was not supported by any evidence presented by DPW. In fact, it is difficult to ascertain why the trial judge found the dissolution deceptive. However, as previously stated, the trial judge had ample evidence to base his judgment and to assess the character of the parents. The trial judge's finding of "deception", while unsupported by evidence, does not alter the existence of ample evidence to support termination.

■ Mother further complains there should be a return to the "status quo" as articulated in *Matter of Lozier* (1983), Ind. App., 453 N.E.2d 345, *trans. denied. Lozier* is distinguishable from the case at bar. In *Lozier,* the legislature had not yet amended IND.CODE § 31–6–5–4(c) to include the option of terminating parental rights upon a showing of harm to the child if the parent-child relationship is continued. DPW proceeded under this section of the statute because of the impossibility of proving remedied conditions. Both parents have been incarcerated for the last few years. Although Mother has undergone some treatment, there is no indication that she is now ready to be a responsible parent. On the contrary, at trial, DPW presented evidence that Mother does not fully accept responsibility for her actions. A return to the "status quo" would return the children to an environment which created the anti-social behavior from which

they are now slowly recovering. A return to the "status quo" in this case would place the parents' interests above those of the child, something this Court refuses to do.

■ Mother and Father's final argument on appeal is that they have been denied their constitutional right to confront witnesses. They rely on *Beck v. State* (1989), Ind.App., 544 N.E.2d 204, 207, in support of their position that, while this is not a criminal proceeding, they have a constitutional right to confront the children about the statements they made.

This Court recognizes the time-honored right of parents to establish a home and raise their children as protected by the Fourteenth Amendment of the United States Constitution, but this right is subordinated to a child's best interest.

> *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 534–535, 69 L.E. 1070, 1077, 45 S.Ct. 571, 573;

> *Meyer v. State of Nebraska* (1923), 262 U.S. 390, 399, 67 L.E. 1042, 1045, 43 S.Ct. 625, 626.

The Juvenile Code specifically makes a distinction between proceedings which are criminal in nature from others. (See IND. CODE §§ 31–6–4–1 (1990 Supp.) and 31–6–7–1 (1988 Ed.) both of which are applicable to IND.CODE § 31–6–5–4.) The requirement of clear and convincing evidence is designed to provide constitutional safeguards by requiring the court to find, by clear and convincing evidence, each element of the statute. *See In re Wardship of R.B.* (1993), Ind.App., 615 N.E.2d 494, 497, *trans. denied* (proof by clear and convincing evidence assures the court that a high degree of probability exists that conditions would not be remedied—standard considerably above the more likely than not implications of the preponderance requirement). Mother and Father correctly argue there are numerous similarities between IND.CODE § 35–37–4–6 and IND. CODE § 31–6–15–1 *et seq.;* however, the main difference, and most important to the case at bar, is the burden of proof required. The legislature has seen fit to require proof beyond a preponderance of the evidence but not to the level of proof beyond a reasonable doubt.

In the present case, the trial court was presented with ample evidence to support its finding that there was a high degree of probability the children would suffer emotional or mental harm if cross-examined. DPW's burden of proof was not to prove beyond a reasonable doubt that the children would suffer emotional or mental harm, but show a "substantial likelihood" by clear and convincing evidence.

Termination of Mother and Father's parental rights was a serious solution to a very serious problem. DPW's petition for termination of parental rights can only be granted in cases where the parents have provided a lifestyle wholly inadequate for a child's survival. DPW has proved by clear and convincing evidence each element of the IND. CODE § 31–6–5–4. There being no error, the decision of the trial court is affirmed.

Affirmed.

GARRARD and STATON, JJ., concur.