## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 05 2015, 9:41 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Michael B. Troemel
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

K.H. (Minor Child),

And

P.V. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 5, 2015

Court of Appeals Case No. 79A02-1412-JT-858

Appeal from the Tippecanoe Superior Court.

The Honorable Faith A. Graham, Judge.

Cause No. 79D03-1403-JT-10

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, P.V. (Father), appeals the trial court's Order terminating his parental rights to his minor child, K.H. (Child).

We affirm.

## ISSUE

Father raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the Indiana Department of Child Services (DCS) presented sufficient evidence to support the termination of Father's parental rights.

<u>FACTS AND PROCEDURAL HISTORY</u>[1]

Father and E.W. (Mother)[2] are the biological parents of the Child, born October 3, 2005. Father and Mother have never been married, and they ended their relationship upon Mother learning that she was pregnant with the Child. At the time of the Child's birth, Father was incarcerated, so Mother was the Child's sole custodian. Father's first interaction with the Child was not until after she was six months old, and Father began visiting with her a few times per month when she was two years old.

Sometime in 2009, Mother and the Child moved to Arizona. Then, in May of 2010, Arizona's Department of Child Safety removed the Child from Mother's custody due to her mental illness and expression of desire to harm her three children. The Child was subsequently placed in foster care. At the end of March 2011, Father moved to Arizona in order to participate in reunification services, and he obtained custody of the Child in October of 2011. Thereafter, Father and the Child returned to Lafayette, Tippecanoe County, Indiana.

---

[1] In accordance with the revised Administrative Rule 9(G), certain evidence was submitted to our court which is declared confidential and must be excluded from public access. *See* Ind. Administrative Rule 9(G)(2); Ind. Code § 31-39-1-2 (declaring the confidentiality of juvenile court records). Despite the parties' non-compliance with the Administrative Rule, we have endeavored to maintain confidentiality on appeal. However, as a number of facts derived from the confidential records are "essential to the resolution of litigation[,]" we have included confidential information in this decision only to the extent necessary to resolve this appeal. Admin. R. 9(G)(7)(a)(ii)(c).

[2] On August 15, 2014, Mother executed a voluntary consent to terminate her rights to the Child. Mother is not a party to this appeal, although facts pertaining to Mother are included where appropriate.

[6] Between October of 2011 and January of 2012, Father and the Child were the subject of twelve different DCS assessments. In one of these instances, it was reported to DCS that the Child had been sexually molested. She was taken to Riley Children's Hospital in Indianapolis for an examination, during which the Child's physician discovered vaginal moles which required further evaluation. Father was instructed to seek follow-up treatment with a dermatologist to ensure that the moles were not cancerous.

[7] On the evening of February 2, 2013, the Lafayette Police Department was dispatched to Father's apartment in Lafayette regarding a noise complaint. When police officers entered the apartment, they discovered the Child lying in bed, under the covers, with Father's male friend, R.B. Both R.B. and the Child were fully clothed, and Father was present in the same room. However, when questioned as to why the Child was in bed with R.B., both R.B. and Father refused to provide an explanation. The officers read the recent report of sexual abuse allegations involving the Child, which noted specific concerns about the fact that Father allows his adult friends to have access to the Child. The officers also discovered that a protective order obtained by the landlord prohibited R.B.'s presence on the property due to stabbing incidents in 2009 and 2010. In addition to the Child, Father, and R.B., several other individuals were present in the home that evening and were intoxicated.

[8] The next day, DCS conducted a home visit at the apartment in order to interview Father and the Child. Father refused to answer the door, even after he learned that it was DCS. DCS was eventually granted access by the

landlord. However, Father refused to allow DCS to speak with the Child out of his presence. When questioned by DCS, the Child expressed that she did not want to anger her Father, and she exhibited fear of the police. DCS inquired about the recent substantiated report of sexual abuse, and Father admitted that he did not pursue the recommended follow-up procedures for the Child's vaginal moles. Father also indifferently dismissed the possibility that the Child had ever been sexually abused.

[9] DCS inspected the apartment and learned that the Child shared a bedroom with Father and R.B., which contained one queen-sized mattress and a small couch. When asked about the specific sleeping arrangements in the room, Father provided only vague responses. DCS also observed that the floor was cluttered, and "[i]t did not appear that any type of mattress, bed or blanket was being used at night to separate the three [people]." (DCS Exh. 1, p. 2). DCS also discovered that there had been numerous calls made to law enforcement in reference to Father and the Child, including multiple suicide attempts by Father. Throughout DCS' investigation, Father remained uncooperative, such as by refusing to sign releases for DCS to contact medical personnel and other collateral contacts regarding the Child. Furthermore, DCS also noted that Father had not remedied issues from past reports, including his lack of housing stability and the Child's exposure to unsafe environments. As a result, on February 4, 2013, DCS removed the seven-year-old Child from Father's custody and placed her with her paternal great-uncle, D.V., and great-aunt, S.V.

The same day, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS).

[10] Pursuant to a mediation agreement, Father admitted to the allegations raised in the CHINS petition—namely, that he struggles to meet the Child's basic needs; lacks independent housing; fails to implement structure and stability for the Child; has been resistant to services that would benefit his Child; has an extensive criminal history; has put the Child in unsafe situations and allowed his adult friends frequent access to the Child; failed to seek appropriate medical treatment; and has been uncooperative with DCS. Thus, on April 22, 2013, the trial court adjudicated the Child to be a CHINS. For his parental participation plan, Father was ordered, in part, to receive a psychological evaluation and follow all recommendations; obtain and maintain adequate housing; maintain employment and attain financial stability to be able to provide for the Child; and participate in the Fatherhood Engagement Program, therapy, and other case management services. Father was also directed to participate in supervised visitation with the Child.

[11] At the time of her removal, the Child was performing poorly in school. Although a first grader, the Child was required to spend half of her days in a kindergarten classroom. The Child was provided an individual education plan in order to receive extra assistance with her learning disability and speech impairment. The Child also exhibited severe behavioral issues, and would cry, scream, and kick at school. She was also overly affectionate with her relative placement and service providers, and she bonded too easily to strangers. About

a week after her removal, the Child was interviewed for an Early Mental Health Screening. The therapist observed that the Child "does not demonstrate Stranger Danger as is appropriate for a child her age. Stranger Danger includes being cautious around new people until they have demonstrated their trustworthiness." (DCS Exh. 4, p. 4). The therapist also found that when "extremely anxious," the Child "demonstrates a need of control rather than appropriate manners"—such as when visiting with her Father. (DCS Exh. 4, p. 5). It was concerning to the therapist that the Child had apparently witnessed several episodes of violence while in Father's care. The Child was diagnosed with post-traumatic stress disorder (PTSD).

[12] In June of 2013, Father completed a psychological evaluation with Dr. Jeff Vanderwater-Piercy (Dr. Vanderwater-Piercy), a licensed clinical psychologist. Dr. Vanderwater-Piercy diagnosed Father with Neglect of Child and Antisocial Personality Disorder with Narcissistic Traits. Dr. Vanderwater-Piercy further concluded:

> [Father's] interactions with DCS and service providers, including this examiner, have been extremely self-protective in nature to the degree of indifference toward his daughter. According to the records reviewed by this examiner, there have been missed visits, a reluctance to examine issues and concerns relevant to the safety and well[-]being of his daughter, and at times an apparent lack of interest in and emotional connection to his daughter. The test results from the current evaluation suggest that [Father] is of average intelligence and can espouse attitudes and beliefs that are consistent with good parenting. However, his actions (past parenting behaviors and interactions with service providers) are more reflective of an indifferent and self-centered approach to parenting in which there is a lack of

appropriate attentiveness and responsiveness to the needs and feelings of the [C]hild.

At the present time, [Father] has very little interest in self-examination and therefore is not a good candidate for therapy. His primary concern is that of protecting himself and therefore he will likely remain very guarded and selective in what he discloses. [Father] may be compliant with services, such as the Fatherhood Engagement Program, but his level of investment in learning from services will likely be low. [Father] will probably be inclined to deflect responsibility away from himself, rationalize his behavior, minimize concerns, and seek to put others on the defensive. In terms of case management, it will be important to establish clear expectations regarding [Father's] level of participation and the changes/improvements necessary for reunification to occur, all the while keeping the focus on [Father] and his behavior.

(DCS Exh. 9, pp. 14-15).

[13] In accordance with Dr. Vanderwater-Piercy's expectations, Father was resistant to participate in the Fatherhood Engagement Program and other DCS services. Between the date of the Child's removal and the termination hearing, Father's supervised visitation services were discharged on five separate occasions due to his non-compliance with the various facilitators' attendance policies. Father's home-based family specialist noted that Father failed to see the importance of communicating with the Child outside of their scheduled visits, and he displayed no interest in being involved in the Child's treatment. Father also repeatedly stated that he had no need for services and declined any assistance with finding suitable housing or employment. He did, however, sublease a one-bedroom apartment on his own in May of 2013, and he was employed by several fast-food restaurants at various intervals throughout the case. As part of the Fatherhood Engagement Program, a therapist offered to provide counseling

and assistance with parenting skills, but Father stonewalled the therapist's attempts to schedule regular appointments. During the few appointments that he did attend, Father refused to discuss personal or emotional issues.

[14] After taking the Child into custody, D.V. and S.V. arranged for the Child to receive the necessary medical care which Father had declined to pursue. On July 12, 2013, the Child had surgery at Riley Children's Hospital for the removal and biopsy of her vaginal moles. Father was present at the hospital during her surgery, but he did not attend her follow-up appointment on August 7, 2013, despite the instruction from DCS to do so.

[15] On July 17, 2013, during a therapy session, the Child disclosed significant details about being molested by Father's friend. The Child reported that she had been exposed to pornographic movies while a man named David was babysitting her. She stated that David "had her watch the 'adult movie' . . . so that she knew what to do." (DCS Exh. 5). The Child graphically described how David repeatedly molested her on different occasions, including by inserting his penis into her vagina. She used a bundle of crayons to represent David's penis and explained "[t]hat is where the white milky stuff comes out." (DCS Exh. 5). The Child also indicated that at least once, Father had walked into the room where the Child had been alone with David and, upon seeing "the white milky stuff on the ground," he became angry and walked out. (DCS Exh. 5). However, the Child reported that Father continued to allow her to be alone with David. During a subsequent therapy session, the Child explained

that R.B. also babysat, but he never acted inappropriately as David did. When Father later learned of the Child's allegations, he accused her of lying.

[16] On September 3, 2013, the Child worked on a trauma narrative book with her therapist. When discussing living with Father, the Child stated that he had previously thrown her across the room and put her head in the sink. She stated, "My daddy doesn't know how to take care of kids." (DCS Exh. 5). Also in September of 2013, Father informed DCS that he was homeless. He declined offers from service providers to assist him in securing new housing and obtained an apartment two months later.

[17] Following a hearing, on November 3, 2013, the trial court found Father to be in contempt for failure to comply with his parental participation order. Specifically, Father had failed to keep his appointment for his Fatherhood Engagement Program and had not been able to maintain suitable housing. The court also noted that three different visitation facilitators had discharged Father from services on four separate occasions. The trial court ordered Father to provide proof of his residency and income to DCS. On October 17, 2013, Father completed the *24/7 Dad* workbook and was successfully discharged from the Fatherhood Engagement Program. However, he continued to demonstrate a lack of involvement in other recommended services, such as therapy. On December 16, 2013, the trial court again found Father to be in contempt for failing to comply with his parental participation order. This time, Father was cited for failing to provide documentation to DCS regarding proof of residency and income. The trial court ordered Father to provide DCS with financial and

employment information for the previous two months and, going forward, to continue supplementing his income information.

[18]    On March 13, 2014, the trial court approved the change of the permanency plan from reunification with the parents to termination of parental rights. At that point, Father inquired about improvements he could make to prevent termination. The Child's court-appointed special advocate (CASA) advised Father to work on building a support system, and the Child's therapist suggested family therapy. Father did not heed either recommendation. However, he did commence individual therapy with Dr. Cathy Streifel (Dr. Streifel), a psychologist. For the first time since the onset of the case, Father began making a genuine effort to "talk about some things that [are] hard for him to talk about." (Tr. pp. 16-17). In addition to paying for the sessions himself, Dr. Streifel explained that Father has maintained consistent attendance. Dr. Streifel also noted that, despite his willingness to at least engage in topics that he previously refused to discuss, Father remains emotionally detached from the Child, and he has never "acknowledged it as a problem" that the Child has been exposed to inappropriate situations and continues to exhibit sexualized behaviors. (Tr. p. 23).

[19]    On March 18, 2014, DCS filed a petition to terminate the parental rights of Father and Mother. On June 10 and August 15, 2014, the trial court conducted a termination hearing. During the hearing, the DCS case manager, the Child's therapist, and the Child's CASA all recommended that Father's parental rights

be terminated. On November 21, 2014, the trial court issued an Order, terminating Father's rights to the Child.

[20] Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[21] "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility." *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). On appeal, our court does not reweigh evidence or judge the credibility of witnesses. *Id.* at 642. Rather, we will only consider the evidence that supports the judgment and any reasonable inferences which may be drawn from that evidence. *Id.*

[22] In this case, the trial court issued special findings of fact and conclusions thereon; accordingly, our review is further guided by Indiana Trial Rule 52(A). Our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). When reviewing findings of fact and conclusions thereon for clear error, our standard of review is two-tiered. First, we must determine whether the evidence supports the trial court's findings; second, we must consider whether those findings support the judgment. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "Clear error is that

which leaves us with a definite and firm conviction that a mistake has been made." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013).

## II. *Termination of Parental Rights*

[23] "[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied*. In fact, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[24] The involuntary termination of a parent's rights is not intended to punish the parent; ultimately, it is meant to protect the child. *S.L.*, 997 N.E.2d at 1123. Termination of parental rights is the most extreme sanction a court can impose, and because it permanently severs a parent's rights to his or her children, it is "intended as last resort, available only when all other reasonable efforts have failed." *Id.* at 1123-24. As such, in Indiana, in order to terminate a parent's rights, DCS must prove, in relevant part:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under [Indiana Code section] 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each element by clear and convincing evidence—"a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d at 642 (quoting *In re G.Y.*, 904 N.E.2d at 1260-61 & n.1); *see* I.C. § 31-34-12-2.

[25] On appeal, Father does not challenge that the Child has been removed from her parents for the requisite time or that DCS has established a satisfactory plan for

the Child's care and treatment. Instead, he claims that the trial court erred by concluding (1) that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being; (2) that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside the home will not be remedied; and (3) that termination is in the Child's best interests.

### A. *Continuation of Parent-Child Relationship Poses Threat to Child's Well-Being*

Father first claims that there is insufficient evidence to establish that the continuation of the parent-child relationship poses a threat to the Child's well-being. It is well established that a trial court should assess a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). Furthermore, "[c]lear and convincing evidence need not reveal that 'the continued custody of the parent[] is wholly inadequate for the child's very survival.' Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." *Id.* at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233-34 (Ind. 1992)).

In this case, the trial court concluded that

> [c]ontinuation of the parent-child relationships poses a threat to the well-being of the [C]hild. The [C]hild needs stability in life. The [C]hild needs parents with whom the [C]hild can form a permanent and lasting bond to provide for the [C]hild's emotional and psychological as well as physical well-being. The [C]hild's well-being

would be threatened by keeping the [C]hild in parent-child relationships with either parent.

(Appellant's App. p. 23). In support of this conclusion, the trial court specifically found that Father has consistently demonstrated instability in both his housing and employment; that Father failed to seek necessary medical care for the Child's vaginal moles; that Father has an extensive criminal history; that Father has a longstanding history of unresolved mental health issues, including multiple suicide attempts; that Father has denied any responsibility for the fact that the Child was molested because he allowed adult males to have unsupervised access to the Child; and that Father only minimally participated in DCS services, during which he "was not invested in [the Child's] therapy" and he did nothing to improve his parenting skills. (Appellant's App. p. 23). In addition, the trial court found:

> 18. Despite the CHINS case, concerns regarding the safety of the [C]hild remain. The parents continue to lack the ability to protect the [C]hild, manage basic needs on a daily basis without assistance, and provide the [C]hild with the necessary support to address her trauma. The parents pose a continued danger to the [C]hild's long-term health and safety by failing to protect her from abuse and neglect.
>
> 19. Although Mother and Father love this [C]hild, neither has the ability to meet the [C]hild's needs. The long-standing history of instability displayed by these parents continues today. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationships would be detrimental to the [C]hild. The [C]hild needs permanency now.

(Appellant's App. p. 23).

[28] Father does not specifically challenge any of the trial court's findings. Rather, the entirety of his argument provides:

> DCS claims that [he] will not provide a financially stable and safe home, and will not meet [the Child's] therapeutic needs. The evidence of [Father's] income, employment, housing and visitation indicates otherwise. . . . DCS attempts here to really argue that because there [is] a better placement, that [Father] therefore poses a risk. A trial court shall not consider the best interest of a child until parental unfitness is proved.

(Appellant's Br. p. 10) (citing *In re Tucker*, 578 N.E.2d 774, 779 n.5 (Ind. Ct. App. 1991), *trans. denied*). We initially find that Father's argument is largely a request to reweigh evidence, which we decline to do. Moreover, there is sufficient evidence in the record to support the trial court's determination that the continuation of the parent-child relationship poses a threat to the Child's well-being.

[29] First, the Child required follow-up care to ensure that her vaginal moles were not cancerous, and we find it highly disturbing that Father ignored the Child's medical needs. Instead, it was not until the Child was placed with D.V. and S.V. that the Child was examined and it was determined that the moles were benign. Also compelling is the fact that Father refused to admit that he neglected his parental responsibility to seek medical treatment for the Child.

[30] Second, Father demonstrated an utter lack of interest in the Child's therapeutic needs. *See Everhart v. Scott Cnty. Office of Family & Children*, 779 N.E.2d 1225, 1234 (Ind. Ct. App. 2002) (finding sufficient evidence to terminate the parental rights of a father who had subjected his children to abuse and subsequently

displayed a complete "lack of interest in the well-being of the children while he was incarcerated"), *trans. denied*. According to the Child's Early Mental Health Screening, the Child suffers from PTSD as a result of her parents' recurring failure to keep her safe, and she "is at significant risk for mental health issues." (DCS Exh. 4, p. 12). The DCS case manager testified that Father has "never really addressed therapeutically that [the Child] is a victim of sexual abuse." (Tr. p. 175). The Child "demonstrates behaviors associated with physical abuse, sexual abuse, emotional abuse, and neglect" which will require ongoing therapeutic treatment. (DCS Exh. 4, p. 12). Not only has Father never participated in therapy with the Child or expressed any concern about the Child's emotional well-being, he has repeatedly accused the Child of lying about being a victim of sexual abuse. The DCS case manager testified that if the Child were to be placed in Father's care, Father would not ensure that she continues to receive her much-needed therapeutic treatment. Given Father's lack of concern about the Child's physical health and his apathy toward participation in services throughout this case, we agree with DCS that there is a high probability that Father would fail to take the necessary steps to safeguard the mental health of the Child.

[31] Third, the evidence establishes that Father has made no effort to address his own mental health issues during the pendency of the case. *See In re S.L.H.S.*, 885 N.E.2d 603, 616-17 (finding a father posed a continuing threat to the child's safety and well-being because he had not addressed his psychological issues or past molestation issues). Although Father was referred for counseling services

throughout the entire case, he did not actively participate in therapy until just a few months prior to the termination hearing. The Child was removed from Father's care, in part, based on the fact that he allowed his friends and roommates to have unfettered access to the Child, which ultimately resulted in her molestation. To this day, Father fails to accept responsibility for—or even recognize—that he routinely placed his Child in dangerous situations, which is a strong indicator that he will repeat the same behavior in the future. *See In re E.M.*, 4 N.E.3d at 643 (stating that "parents' past behavior is the best predictor of their future behavior").

[32] Fourth, although Father was having regular visitation with the Child up until the termination hearing, the Child reiterated to her therapist and other service providers that she did not like visiting with Father because she was afraid of him. The DCS case manager and CASA both testified that Father and the Child have not bonded, and the CASA testified that she does "not believe [Father] would keep [the Child] safe[,]" and it is apparent that the Child does not trust Father or feel safe with him. (Tr. p. 214). Even Father's therapist, Dr. Streifel, testified that she had expressed concerns to Father "about his ability to develop a strong emotional bond with [the Child]" because he is so emotionally detached. (Tr. p. 18).

[33] Fifth, at the time of the termination hearing, Father was living in a two-bedroom apartment, but he has failed to demonstrate any long-term stability or ability to meet the Child's daily needs on a permanent basis. *See C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 94 (Ind. Ct. App. 2014). Because the Child

was removed from Father's care based, in part, on the fact that Father allowed his friends and roommates to have unsupervised access to the Child, it was necessary for Father to establish that he could financially sustain housing for himself and the Child without having to rely on a roommate. Additionally, the evidence reveals that the Child suffers from attachment issues as a result of having to frequently move. Yet, during the pendency of this case, Father moved approximately three times and was also homeless for several months. Also, in December of 2013, Father's home-based case specialist reported that Father was struggling to afford his rent and utilities, but Father consistently rejected the service providers' offers of assistance, and he refused to submit copies of his budget and bills. Throughout the case, Father quit numerous fast food jobs before undertaking self-employment in the construction field. At the termination hearing, Father testified about several construction jobs he had recently completed, but he said nothing to indicate that he had sufficient future work lined up to maintain his income.

[34] Father's instability is further evidenced by the fact that he has an extensive (and violent) criminal history and was arrested twice more during the pendency of these proceedings. First, on April 19, 2013, Father was arrested for trespassing and was subsequently released with a warning to stay away from the residence. Then, he was again incarcerated from September 24-30, 2013, for failing to pay support for his other child. Accordingly, we find no error in the trial court's

conclusion that the continuation of the parent-child relationship poses a threat to the Child's well-being.[3]

### B. *Best Interests of the Child*

Father next claims that the trial court erred by concluding that termination of his parental rights would be in the best interests of the Child. In determining a child's best interests, the trial court is required to consider the totality of the evidence. *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App. 2014), *trans. denied*. In so doing, the trial court should "subordinate the interests of the parent to those of the child[]." *In re A.B.*, 887 N.E.2d at 168.

Father asserts that "[t]he sense people have that [he] is not likeable does not make it best for his [Child] to be forever separated from him." (Appellant's Br. p. 11). He further argues that "it is uncontroverted that he takes [the Child] to the library, reads with her, plays soccer with her, goes fishing with her, takes her skating, to the park and the zoo." (Appellant's Br. p. 11). Finally, Father posits that "[w]hile [he] is admittedly quiet, his visits have been completely supervised, and therefore occur in an artificial setting under a watchful eye. He has been redirected not to accept the affection of his daughter. He has not been given any guidance on his requests to deal with his [Child's] issues."

---

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, DCS need only prove *either* that the conditions resulting in the Child's removal and continued placement outside of a parent's custody will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the child's well-being. *In re I.A.*, 934 N.E.2d at 1133. Because we find no error in the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the Child's well-being, we need not address Father's argument under Indiana Code section 31-35-2-4(b)(2)(B)(i).

(Appellant's Br. p. 11). To the extent that Father requests this court to reweigh evidence, we decline. Moreover, notwithstanding the fact that Father neither raised a specific claim of error by the trial court, nor supported his argument with cogent reasoning and citations to authority, we find ample support in the record for the trial court's determination that the Child's best interests warrant termination. *See* Ind. Appellate Rule 46(A)(8)(a).

[37] During the termination hearing, the DCS case manager, CASA, and the Child's therapist all recommended that termination of the parent-child relationship would serve the Child's best interests. *See C.A.*, 15 N.E.3d at 94-95 (finding sufficient evidence of the child's best interests where the service providers, CASA, and case manager all made recommendations to terminate the parent-child relationship). Here, the Child attended therapy with the same therapist from the time she was removed from Father's care. In recommending termination of Father's rights, the therapist cited to the Child's strong bond with her relative placement and the significant improvement in the Child's behavior since her removal from Father's custody. The therapist also stated that the Child has consistently expressed fear of seeing Father throughout the case. The Child's DCS case manager also recommended that it would be in the Child's best interests for Father's parental rights to be terminated because the Child is "thriving" in her relative placement, and D.V. and S.V. plan to adopt her. (Tr. p. 156). The DCS case manager expressed concern over Father's lack of support with respect to the Child's need for therapy, stating that Father has failed to identify "the importance and understanding that [the Child] is a victim

of sexual abuse and how his role in that played." (Tr. p. 162). The DCS case manager also stated "[t]hat [Father] is focused on himself; that he is indifferent to what others are – to other people's feelings, he's indifferent to [the Child's] feelings, it's more of a game to him. He goes and sees what the outcome will be, but it's more for show." (Tr. p. 167). Finally, the Child's CASA also opined that the Child's best interests required terminating Father's parental rights, stating that Father "is minimally going through what he has to go through to please the court, not really in [the Child's] best interest, but what he has to do to please the court." (Tr. p. 206).

[38]     Furthermore, it is well established that a "trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1235 (Ind. 2013). A "myriad of factors" may be considered in assessing the physical, emotional, and mental well-being of a child. *Id.* Among these factors, "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265). In the present case, the Child has twice been subjected to the arduous proceedings associated with being removed from unfit parents. At the time of the termination hearing, the eight-year-old Child had spent just over one year of her life in Father's care. During that time, DCS conducted twelve assessments in addition to the report which ultimately led to the Child's removal. The Child's placement with D.V. and S.V. is the first time in her life that she has

had a safe and stable home environment, and her need for permanency should not be even further delayed considering that Father has already had ample time to establish his parental fitness.

[39] Although Father may have a sincere desire to be reunited with the Child, he has consistently been unable and unwilling to provide the Child with a safe and stable home environment. D.V. and S.V., however, have provided the Child with a loving, nurturing, and stable home. D.V. and S.V. have ensured that the Child received appropriate medical treatment, and they have actively participated in the Child's therapy. D.V. and S.V. provide much-needed structure for the Child, and, although the Child has numerous issues that will require continued treatment, she has improved both academically and emotionally while in the care of her relative placement. Throughout the course of these proceedings, the Child repeatedly identified D.V. and S.V. "as her family"; she feels safe and comfortable in their care and wants to remain with them. (Tr. p. 156). Considering the totality of the evidence, we find no error in the trial court's determination that termination is in the Child's best interests.

## CONCLUSION

[40] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the termination of Father's parental rights to the Child.

[41] Affirmed.

[42] Bailey, J. and Barnes, J. concur